580 A.2d 221

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. JAMES D. CLAUSELL,
DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued May 7, 1990—Decided August 30, 1990.

300

302

*Lowell Espey,* Designated Counsel, *James K. Smith, Jr.,* Deputy Public Defender, argued the cause for appellant and cross-respondent (*Wilfredo Caraballo,* Public Defender of New Jersey, attorney; *Lowell Espey* and *Christine M. Cook,* Designated Counsel, of counsel; *Lowell Espey, Christine M. Cook* and *Susan T. Sinis,* on the briefs).

*James E. Jones, Jr.,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

A jury convicted defendant, James Clausell, of capital murder, three counts of aggravated assault, possession of a firearm with the purpose to use it unlawfully against the person of another, and possession of a handgun without a permit. Defendant appealed to this Court as of right. *R.* 2:2–1(a)(3). The State concedes that the trial court failed to instruct the jury that defendant could be convicted of capital murder only if he knowingly or purposely caused the death of the victim, as opposed to knowingly or purposely causing serious bodily injury that resulted in death. Because there is a rational basis in the evidence for the jury to have found defendant intended to cause only serious bodily injury, his conviction for capital

murder must be reversed. *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). Errors in the jury instruction on aggravated assault require reversal of those convictions as well.

I

Shortly after midnight on August 12, 1984, Edward Atwood was shot and killed through the front door of his home in Willingboro, New Jersey. At approximately 10:45 on the evening of August 11, while Mr. Atwood was away, his wife and daughter, Tanya, responded to a knock at the front door. Two men whom Mrs. Atwood did not recognize were standing on the front step. Mrs. Atwood testified that one of the men stood directly in front of the door, while the other stood off to the side. The man in front of the door asked, "Ed?," and Mrs. Atwood stated that he was not home. The man to the side of the door responded, "I told you, man." Mrs. Atwood asked the man in the front of the doorway for his name, to which he replied, "Dwayne." The two men then departed.

Because the men were unfamiliar to her, Mrs. Atwood asked her son, Darrell, if he knew anyone named Dwayne. Darrell said that he did not. When Mrs. Atwood noticed the men walking past the house a few minutes later, she and her children watched them from a window on the second floor. None of the Atwoods could identify the two men.

Edward Atwood returned home with his grandparents, Hubert and Bessie Dixon, a little after midnight. While he and his wife were in the kitchen, Tanya came downstairs and, through the window in the front door, saw that the two men had returned. She informed her parents that the men were at the door. As Mr. Atwood approached the front door, one of the men knocked. Mrs. Atwood and Tanya followed Mr. Atwood to the foyer. Both grandparents were close by. Darrell sat at the top of the stairs.

The Atwood home had both a wood and glass interior door and an exterior screen door. When Mr. Atwood opened the

interior door, Dwayne stood in front and, as before, the other man stood to one side. Through the screen door, Dwayne said, "Ed?" Mr. Atwood replied, "you got the wrong guy," and moved quickly to close the door. Darrell testified that as the door was closing, Dwayne moved out of the doorway. The second man stepped forward and, shooting through both doors, fired a shot at Mr. Atwood. As the victim fell, the other members of the family ducked. The unidentified man moved closer to the screen door, and aiming downward, again shot through both doors. Then he ran away. Within hours of the shooting, Mr. Atwood died from a single bullet wound to the left chest. The other bullet, which did not hit him, was later recovered.

The investigation of the Atwood shooting gained momentum early in September. On September 7, 1984, Mrs. Atwood saw a television broadcast of a police photograph of a man identified as Dwayne Wright. She immediately notified Burlington County investigators that she believed it was the same man who had been at her door the night of the shooting. On that same day, investigators, who had been questioning the victim's neighbors, were informed that Roland Bartlett, the owner of the house directly behind the Atwoods', would not speak to them. Around the same time, the Federal Bureau of Investigation notified the Burlington County Prosecutor's Office that an anonymous informant had identified Dwayne Wright, defendant, and a woman named Jennifer Schall as the perpetrators of the Atwood shooting.

Investigators questioned Paul Grant, a friend of Wright, on September 19, 1984, and he provided details of the shooting. Grant identified Wright and defendant as the two men at the Atwood house on August 11, and named Schall as the driver of the "getaway car." When the investigators interviewed Schall on September 24–25, she admitted that on the night of the shooting she had driven Wright and defendant to New Jersey from Philadelphia. She claimed, however, that she had not known that they intended to murder anyone.

Two days later investigators presented Mrs. Atwood with a photographic lineup that contained photographs of Wright, Grant, and defendant. She identified Wright, but not Grant or defendant, as one of the assailants. Viewing the same lineup, Tanya did not identify anyone. A search the next day of the Wright and Clausell residences yielded no evidence.

The Burlington County Grand Jury indicted Wright and defendant for capital murder, *N.J.S.A.* 2C:11–3a(1) and –3a(2); murder, *N.J.S.A.* 2C:11–3; conspiracy to commit murder, *N.J. S.A.* 2C:5–2; five counts of fourth-degree aggravated assault, *N.J.S.A.* 2C:12–1b(4); unlawful possession of a weapon with purpose to use it unlawfully against another, *N.J.S.A.* 2C:39–4a; and unlawful possession of a handgun without a permit, *N.J. S.A.* 2C:39–5b. The two men were tried jointly.

The State sought to establish that defendant and Wright had been hired to kill Atwood by Roland Bartlett, the Atwoods' neighbor and the alleged leader of a Philadelphia drug-distribution ring known as the "Mini Mob." Bartlett had quarrelled with the victim over Bartlett's dog.

At trial, Grant stated that in late June 1984, he had been approached by Anthony Bartlett, Roland Bartlett's son, who asked him to murder "someone" for $5,000. Grant claimed that he refused. He also claimed that he had been with defendant and Wright on August 11, 1984, when defendant's beeper had signalled. According to Grant, members of the "Mini Mob" used the electronic-paging devices as a means of communication.

Grant stated that defendant had responded to the page from a pay phone. Defendant had placed a call and asked to speak to "D," allegedly one of Bartlett's ringleaders. After hanging up, defendant had told Wright, "[t]onight's the night. We need a ride tonight. We have to do it." According to Grant, Clausell and Wright had told him they would each collect $2,000 for the murder. Grant also claimed Wright had told defendant to "get the gun," and that defendant had responded by retriev-

ing a .357 long-barrel Magnum from his house. At approximately 9:30 p.m., Grant saw defendant and Wright enter Schall's blue Camaro and drive away.

Schall, a cocaine dealer who was the girlfriend of defendant's brother, Johnny Clausell, testified under a grant of immunity. She stated that a couple of days before the shooting, in response to defendant's request, she agreed to take him to New Jersey. On August 11, 1984, Wright made a similar request, and she told him that she had already arranged to take defendant there. Before entering Schall's car, somewhat after 9:00 p.m., defendant placed "a ball of newspaper" in the trunk.

While driving, Schall asked the men about the purpose of the trip. Defendant told her that they needed to collect money owed them for drugs. When Schall asked what they would do if the man did not have the money, the men told her they would "smack him around a little bit or beat him up."

According to Schall, the group drove to New Jersey and parked the car down the street from the Atwood home. The men removed the ball of newspaper from the trunk and went to see if the man they wanted was home. Schall waited in the car, and a few minutes later the men returned. The newspaper was gone, and defendant was carrying an object wrapped in his sweatsuit jacket. The men told Schall that the man's wife had said that he was not home, but that they wanted to wait.

After approximately an hour, defendant saw car lights approaching. As instructed, Schall returned to the Atwoods' house. On turning to ask Wright if he was going to talk to the man, she saw that Wright had a gun. Defendant asked Wright for the gun, but Wright replied that it was his turn. The two men left the car with defendant carrying the gun, again wrapped in his jacket. Shortly thereafter, Schall heard two gunshots, and Wright and defendant ran back to the car. The three then returned to Philadelphia.

On the return trip, defendant and Wright discussed going to the Fleetwood Club, allegedly owned by Bartlett, to be paid. Schall dropped the two men at the club and went home.

On the morning after the shooting, Schall saw Wright and defendant on the street. Defendant told her they "did good" and had been paid. They then gave Schall some money for driving them to New Jersey.

Grant also saw Wright the day after the shooting. Wright told Grant that he "took care of business" and was going to be paid. Later, according to Grant, Wright showed him $1,200. Grant testified on direct examination that the phrase "took care of business" referred to a "hit" or a "contract," meaning to "shoot somebody." On cross-examination, he stated that a "hit" meant a "killing."

A couple of days later, Schall saw defendant at the Clausell residence. Defendant told her that the victim had been shot because he had sued Bartlett after Bartlett's dog had bitten him, and Bartlett wanted him "hurt." In fact, Atwood had filed a municipal court complaint against Bartlett for failure to provide water to his dog and for leaving excessive amounts of animal excrement for a lengthy period of time in the dog's kennel. Bartlett was acquitted of the charge of intentional cruelty by failure to provide water, but was fined for the failure to remove excrement.

Sometime later defendant told Schall that the victim had died and that defendant needed her to give him some cocaine so that he could use it to regain the gun from someone to whom he had lent it. Defendant also stated that "they were in trouble" and needed to retrieve the gun.

At trial, defendant and Wright did not deny that Atwood had been shot. Relying on an alibi defense, they claimed that they had not been involved. Neither testified, but Wright presented his girlfriend, Rhonda Clanton, as an alibi witness. She testified that Wright had been with her at the time of the shooting. The defense theory was that it was Grant and defendant's

brother, Johnny Clausell, whom Schall had driven to New Jersey.

Before closing arguments, the trial court dismissed the conspiracy-to-commit-murder charges against both Wright and defendant. After deliberating for about three hours, the jury found defendant guilty of purposeful or knowing murder. It also found that defendant had committed the act by his own conduct, implicitly finding, therefore, that he, not Wright, had shot the victim.

The jury also found defendant guilty of aggravated assault of Mrs. Atwood, Tanya Atwood, and Bessie Dixon, Edward Atwood's grandmother. It acquitted him, however, on the assault charges concerning Darrell Atwood and Hubert Dixon, Edward Atwood's grandfather. Finally, the jury convicted defendant on both weapons charges. The jury returned identical findings against Wright, except that it did not find that Wright had fired the gun. Hence, Wright was not the subject of a death-penalty proceeding, and received a life sentence with thirty years of parole ineligibility on the knowing- or purposeful-murder conviction. On the other convictions, he received a consecutive sentence totaling six years and three months. The Appellate Division affirmed his conviction, and we denied certification. 118 *N.J.* 193, 570 *A.*2d 958 (1989).

In the penalty phase, the State, without adducing additional proof, relied on two aggravating factors: (1) that defendant had knowingly or purposely created a grave risk of death to someone other than the victim, *N.J.S.A.* 2C:11–3c(4)(b); and (2) that defendant had committed the murder for payment, *N.J.S.A.* 2C:11–3c(4)(d).

The defense submitted three mitigating factors: (1) the age of defendant at the time of the offense, *N.J.S.A.* 2C:11–3c(5)(c); (2) the absence of a significant history of prior criminal activity, *N.J.S.A.* 2C:11–3c(5)(f); and (3) any other factor relevant to defendant's character or the circumstances of the offense, *N.J.S.A.* 2C:11–3c(5)(h). Concerning the first two factors, the

State stipulated that defendant was twenty-one years old at the time of the offense and that he had no significant criminal record. Defendant presented five family members to testify in support of the final, "catch-all" factor.

After approximately one-and-one-half hours of deliberations, the jury unanimously found both alleged aggravating factors. The jury also found that all three mitigating factors had been established. Because of some confusion over the requirements of the death-penalty statute, the trial court instructed the jury to determine both whether each aggravating factor outweighed all mitigating factors and whether all the aggravating factors outweighed all the mitigating. The jury unanimously concluded that each aggravating factor outweighed all the mitigating factors beyond a reasonable doubt. It also concluded that all the aggravating factors outweighed all the mitigating factors beyond a reasonable doubt. Accordingly, the court sentenced defendant to death.

## II

■ Defendant asserts that his capital-murder conviction must be reversed because the trial court's jury instruction regarding knowing or purposeful murder did not comply with our decision in *Gerald, supra*, 113 *N.J.* 40, 549 *A.*2d 792. We agree. This Court held in *Gerald* that imposition of a death sentence on a defendant who did not intend to cause his or her victim's death would violate the State Constitution's prohibition against cruel and unusual punishment. 113 *N.J.* at 85, 549 *A.*2d 792. As a result, "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death' under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty." *Id.* at 69, 549 *A.*2d 792.

The State concedes that the jury charge in this case did not distinguish between intent to cause death and intent to cause

serious bodily injury. Because this trial preceded by over two years our decision in *Gerald*, the lack of such a charge is understandable. As we have recently stated, however, if the evidence is "minimally adequate" to provide a rational basis for a finding that defendant intended to cause only serious bodily injury, then defendant's capital-murder conviction must be reversed. *State v. Pennington*, 119 *N.J.* 547, 561, 575 *A.*2d 816 (1990); *State v. Coyle*, 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990). We conclude that the evidence in this case provides that rational basis. Although understandable, the absence of a *Gerald* charge compels reversal.

Objective evidence and the testimony of two prosecution witnesses, Jennifer Schall and Paul Grant, establish the need for a *Gerald* charge. Schall testified that several days after the shooting defendant had told her the reason for the shooting was that Roland Bartlett wanted to "hurt" the victim, Edward Atwood. Paul Grant testified that Wright and defendant had been paid to perform a "hit," and further testified to the effect that in the parlance of the "Mini Mob," "hit" meant "shooting," not necessarily killing. Moreover, when defendant had approached Schall for help in regaining his gun, the implication was that he was surprised that the victim had died, suggesting that defendant had not intended to kill him.

This testimony is confirmed by portions of Schall's pretrial statement to investigators. The statement, as Justice Handler explains in his dissenting opinion, *post* at 357–58, 580 *A.*2d at 251–52, implies that Wright, not defendant, had shot the victim, and that the shooter had aimed low, presumably to injure, not to kill. Specifically, Schall stated in part:

> So, from what they told me, they tried to shoot at this guy and they shot low. He said they were shooting at his legs and that he was just gonna, he was trying to shoot his leg or something like that, hit him in the leg and that he didn't, he didn't think he hit him, he said.

The proposition that the shooter had deliberately aimed low also is supported by the testimony of the victim's son, Darrell

Atwood, who stated that the shooter "pointed downward" when taking the "last shot."

Although other parts of Schall's statement were used to cross-examine her, the material portion was not so used, and the statement was not admitted into evidence. Consequently, we do not rely on it. As a practical matter, however, the statement confirms our conclusion that the record evidence suffices to support a charge that defendant intended not to kill, but to cause serious bodily injury.

Further confirmation appears from the circumstances of the shooting. The shooting occurred at night, and the lighting may have been obstructed. Two doors blocked defendant's view. At the time of the shooting, Atwood had nearly closed the interior door. Thus, not only was defendant's view blocked, but he shot through both the outer screen door and the partially-closed interior wood door. Defendant quickly fired two shots through the doors, and did not pursue Atwood into the foyer. Arguably, if his intent was not to injure but to kill, he would have pushed open the door to assure that Atwood was mortally wounded. Instead, after having fired two shots, only the first of which struck the victim, defendant fled.

The trial court also perceived some ambiguity in the evidence regarding defendant's intent, and charged the jury on aggravated and reckless manslaughter as well as knowing or purposeful murder. Although such a charge does not prove that defendant intended to cause only serious bodily injury, "[t]o the extent that the evidence sufficed to support a charge that he acted recklessly, it raised the possibility that [defendant] did not intend to cause death." *Pennington, supra,* 119 *N.J.* at 562, 575 *A.*2d 816.

In his dissent, Justice Stein concludes that the evidence supports only one conclusion, that defendant intended to kill the victim. *Post* at 376–77, 580 *A.*2d at 261–62. For the reasons previously set forth, we disagree. *Ante* at 313–14, 580 *A.*2d at 228–29. As we recently wrote, moreover, "[i]t may be that

another jury confronted with the same evidence will reach the same result. Defendant, however, is entitled to a fair trial. Sustaining the verdict in the face of an incorrect charge would deprive him of that right." *State v. Martin,* 119 *N.J.* 2, 34, 573 *A.*2d 1359 (1990).

In the absence of a charge in accordance with *Gerald,* we cannot determine whether the jury convicted defendant of purposely or knowingly causing death or purposely or knowingly causing serious bodily injury. See *Pennington, supra,* 119 *N.J.* at 560, 575 *A.*2d 816. Because the evidence here could rationally support a finding that defendant intended only serious bodily injury, we reverse defendant's capital-murder conviction and remand the matter for retrial.

### III

■ Defendant asserts that because the trial court's instruction regarding aggravated assault was erroneous, his convictions for that offense must also be reversed. We agree and conclude that error was sufficiently prejudicial to warrant reversal of defendant's assault convictions.

A person is guilty of aggravated assault if he or she "[k]nowingly under circumstances manifesting extreme indifference to the value of human life points a firearm * * * at or in the direction of another whether or not the actor believes it to be loaded." *N.J.S.A.* 2C:12–1b(4). Under the New Jersey Code of Criminal Justice (the Code), "a person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result." *N.J.S.A.* 2C:2–2b(2). Thus, a person can commit an aggravated assault within the meaning of *N.J.S.A.* 2C:12–1b(4) only if he or she is aware that it is practically certain that his or her conduct will result in the pointing of a firearm at or in the direction of another person.

In this case, the trial court did not inform the jury that it could convict defendant of aggravated assault only if it found

that defendant was aware that it was practically certain that when he pointed the gun into the Atwood foyer, he was pointing it at or in the direction of persons other than Edward Atwood. When outlining the elements of aggravated assault, the court failed to charge the jury that to find defendant guilty, it must first find that defendant was aware of those other persons. Although the court defined "knowing" conduct, it suggested that defendant had to know merely that he was pointing a gun, not that he had to know he was pointing it at or towards a person. The court stated, in relevant part:

> [The indictment in this case] charges aggravated assault separately against all the other members of the family who were there in the hallway. * * * In order for you to find a defendant guilty of [aggravated assault], the State has to prove the following two elements.

> First, that the defendant pointed a firearm at or in the direction of another. Whether or not the defendant believed the gun to be loaded. And second, that the defendant acted under circumstances he was aware of and which manifested extreme indifference to the value of human life.

> [A] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of a particular nature or that the attendant circumstances exist or he's aware of the high probability of their existence. A person acts knowingly with respect to the result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. One is said to act knowingly if he acts with knowledge, consciously if he comprehends his act. In other words, when the defendant pointed a firearm, he was aware that he was doing so or he was aware that it was highly probable that his act may result in the pointing of a firearm in such a fashion. It is immaterial whether or not any of the other members of the family were the people who were intended to be the victim of this. It doesn't matter who the person intends to be pointing at, as long as he does point at someone.

> \* \* \* \* \* \* \* \*

> What does the charge * * * mean when they say [sic] point a firearm at somebody? If I point a firearm at the jurors who are sitting in the front middle of the jury box, I am also said to be pointing a firearm at the people who are sitting around hear [sic] them. So the statute doesn't try to get into that kind of a distinction. It is really a matter for your common sense and judgment. * * * [I]t is on the discretion of the jury as to whether you would consider under those circumstances the firearm was pointed in your direction in that it was under circumstances manifesting extreme indifference to the value of human life.

Defense counsel objected to the charge because it indicated that aggravated assault consisted of only two elements: (1) pointing the gun at or in the direction of another person; (2) under circumstances manifesting extreme indifference to human life. The court did not, however, provide a curative instruction.

Defense counsel also objected that the charge implied that the victim's subjective state of mind was determinative of where the gun was pointing. In response, the trial court gave the following supplemental instruction:

> During the course of these discussions, I talked with you about the charge of aggravated assault. And I discussed with you the fact of it is a jury decision as to whether a pistol is pointed at somebody. The statute says, if you point a pistol at or in the direction of a person under circumstances manifesting an extreme indifference to the value of human life, that's an offense. The question of whether it is at or in the direction [of another] is a question for the jury to decide. And you base it on what you envision happened and not on what the people say the gun was pointed at them feel. In other words, this is the kind of question where you don't look at the minds of the people who are apparently the victims. You look at the reality of the situation and you decide what really happened.

Thus, while the court correctly informed the jury that it was to decide if defendant had pointed the gun at someone, the court failed to note that to find defendant guilty, the jury must also determine whether defendant knew the gun was pointed at someone other than Edward Atwood. Neither counsel objected to the charge on this ground, which is raised for the first time on appeal.

In our view, the erroneous charge had a "clear capacity to bring about an unjust result," and requires reversal of defendant's aggravated-assault convictions. *See State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970). This Court has recognized that " '[a]ppropriate and proper charges to a jury are essential for a fair trial.' " *State v. Collier,* 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (quoting *State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981)). As a result, "erroneous instructions on material issues are presumed to be reversible error * * * [and] are 'poor candidates for rehabilitation under the harmless error philoso-

phy.'" *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986) (quoting *State v. Simon*, 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979)); *accord State v. Weeks*, 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987).

As previously indicated, when defining "knowing" conduct in connection with the aggravated-assault charges, the court repeatedly stated that the crime consisted of only two elements. Thus, the charge undermined the importance of a finding that defendant acted knowingly. *See State v. Butler*, 27 *N.J.* 560, 594–95, 143 *A.*2d 530 (1958) (noting that "[t]he criminal law cannot be administered justly or efficiently if the jury is allowed to speculate as to what conduct the law intended to proscribe by a specified crime"). As defendant argues, the overall effect of the instruction was to suggest to the jury that it did not matter whether defendant was aware that it was practically certain that he was pointing the gun at other family members in the foyer. Under the Code, however, such awareness is crucial for conviction under *N.J.S.A.* 2C:12–1b(4).

The State incorrectly asserts that the trial court dismissed the aggravated-assault charges as to Darrell Atwood and Hubert Dixon. In fact, the jury acquitted defendant on those counts, convicting him of assault only of Tanya Atwood, Valerie Atwood, and Bessie Dixon. That acquittal, however, does not prove that the jury understood the necessity of finding that defendant had acted knowingly. Rather, the jury could have found merely that defendant had not pointed the gun at or in the direction of Darrell Atwood or his great-grandfather based on their location in the foyer. In the absence of a proper charge, we cannot assume the jury found defendant had knowingly pointed the gun at the three other family members. As a result, defendant's assault convictions also are reversed and remanded for retrial.

## IV

Defendant raises numerous other grounds for reversal of his conviction and death sentence. He argues that the Death

Penalty Act (the Act) is unconstitutional because it fails sufficiently to narrow the jury's discretion in determing who will receive the death penalty. We rejected a similar claim in *State v. Ramseur*, 106 *N.J.* 123, 182–97, 524 *A.*2d 188 (1987), and decline defendant's invitation to reconsider that holding. Defendant also asserts that because the decision to seek the death penalty is left to the discretion of the county prosecutor, it is inevitably imposed in an arbitrary and capricious manner, in violation of the eighth and fourteenth amendments to the federal constitution. We have rejected that argument as well in *State v. Koedatich*, 112 *N.J.* 225, 250–54, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), and reaffirm that holding today.

Because we are reversing defendant's conviction and sentence on other grounds, we do not address every argument raised on appeal. Certain of the alleged errors arose because defendant was tried jointly with Wright, a circumstance that will not recur on remand. We limit our discussion to those issues that may arise again on retrial.

### A. *Voir–Dire Questionnaire*

■ Defendant argues that he was denied the right to a fair trial by an impartial jury because the trial court failed to ensure that the death-qualification process did not bias the jury. *U.S. Const.* amends. VI and XIV; *N.J. Const.* of 1947 art. I, para. 10. Before the *voir dire*, prospective jurors were asked to complete a seven-page questionnaire. An entire page of that document outlined the procedures to be followed during the penalty phase of a capital trial. That explanation concluded with the following statement:

> Like the general population of our country, the people in this jury panel probably have widely differing opinions. Some of you may believe that the death penalty should never be imposed no matter what crime the defendant committed. Others may believe that the death penalty should always be imposed if a defendant is found guilty of murder no matter what the circumstances. Some of you may believe that the death penalty is proper in some

cases but not others. Some of you may not have formed opinions on the subject.

Having any of these views does not necessarily disqualify you from serving on the jury in the case. You are disqualified only in [sic] your view is so hard and firmly held that you will not follow my instructions at the close of the trial with respect to whether a defendant is guilty, or if found guilty, whether the death penalty should be imposed.

In short, your views about the death penalty disqualify you only if they would prevent or substantially impair your ability to perform your duties as a juror and follow my instructions.

Before beginning the selection of the jury, the court summarized these statements in its introductory remarks to the prospective jurors.

We reviewed a similar questionnaire in *State v. Williams*, 113 *N.J.* 393, 411–13, 550 *A.*2d 1172 (1988), and stated that we "have serious reservations concerning the propriety of this type of instruction * * * [because] it effectively tells a juror what answers * * * lead to automatic excusal and what responses avoid excusal." *Id.* at 412, 550 *A.*2d 1172. On remand, the trial court should avoid such language in its jury questionnaire. Although it would be helpful for the court to provide an outline of the Act, *id.* at 412 n. 5, 550 *A.*2d 1172, it should not specify the views that would disqualify a prospective juror.

### B. *Evidence of Other Crimes*

In their trial testimony, Grant and Schall referred to other criminal acts allegedly committed by defendant. That evidence, defendant contends, was inadmissible under *Evidence Rule* 55. He further contends that the trial court's failure to issue a limiting instruction constitutes plain error. *R.* 2:10–2. In response, the State argues that all testimony regarding defendant's prior criminal conduct was admissible to prove defendant's intent and motive in killing Edward Atwood.

Our analysis begins with *Evidence Rule* 55, which provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong on another specified occasion but, subject to Rule 48, such

evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

■ Under the Rule, specific instances of past misconduct not the subject of a criminal conviction are inadmissible to prove that defendant is a ."bad man" and therefore likely to commit crimes. *State v. Moore,* 113 *N.J.* 239, 275, 550 *A.*2d 117 (1988). When evidence of other crimes is admitted to prove some other material fact, the court should give a limiting instruction. *See State v. Stevens,* 115 *N.J.* 289, 304, 558 *A.*2d 833 (1989). In that regard, *Evidence Rule* 6 provides that "[w]hen relevant evidence is admissible * * * for one purpose and is inadmissible * * * for another purpose, the judge shall restrict the evidence to its proper scope and instruct the jury accordingly." Moreover, evidence regarding a defendant's prior misconduct must be excluded under *Evidence Rule* 4 if the trial court concludes that the prejudicial impact of such evidence outweighs its probative value. *Ramseur, supra,* 106 *N.J.* at 265, 524 *A.*2d 188. *See generally Stevens, supra,* 115 *N.J.* at 298–304, 558 *A.*2d 833 (discussing history and application of *Evidence Rule* 55).

Defendant points to numerous instances in which Grant and Schall referred to criminal activity engaged in by Roland Bartlett's "Mini Mob," and thus, inferentially, by him. Defendant also contends that their references to threats and attacks made against them as a result of their testifying at defendant's trial implied that he was guilty merely by association with Bartlett's organization.

■ The State correctly notes that the bulk of the challenged testimony was properly admitted to prove defendant's motive for shooting Atwood. Although evidence regarding the "Mini Mob" was necessarily damaging to defendant, it was not prejudicial. Indeed, some of the testimony to which defendant now objects was adduced on cross-examination by his own counsel. Unlike the evidence at issue in *State v. Rose,* 112 *N.J.* 454, 505–06, 548 *A.*2d 1058 (1988), the testimony about defendant's

prior bad acts was neither abundantly repetitive nor highly inflammatory. Because the evidence had a limited purpose, however, a limiting instruction should have been given, even though defense counsel never requested one. *Id.* at 507, 548 *A.*2d 1058. We need not determine whether the absence of such an instruction, standing alone, would be sufficient to require reversal. On remand, if the damaging testimony is again elicited, the trial court should give a limiting instruction.

As to the witness Schall, some of her testimony is related only tangentially to defendant's motive for shooting the victim. For example, Schall described an insurance-fraud scheme in which defendant and his brother assisted her in burning her car so that she could obtain the proceeds.

We need not, however, predetermine the admissibility of this testimony. For our purposes, it suffices to caution the trial court that on remand it should carefully consider whether these and similar references to prior bad acts by defendant would be admissible under *Evidence Rule* 55. The court should also determine whether the probative value of such evidence outweighs its prejudicial impact. *Evid.R.* 4. If it does not, the evidence should be excluded. *Ramseur, supra,* 106 *N.J.* at 266, 524 *A.*2d 188.

## C. *Identification Evidence*

Defendant also challenges the identification of co-defendant, Dwayne Wright, from his voice and from a photographic array. Before trial, Valerie Atwood, the victim's widow, selected Wright's picture from a photographic array compiled by investigators from the Burlington County Prosecutor's Office. She identified Wright as the man who had called himself "Dwayne." Although defendant's picture was also included in the photographic lineup, Mrs. Atwood did not identify him as the second man at her house on August 11. Tanya Atwood was shown the same array, but did not recognize any of the men in the police photographs. She did, however, identify Wright at trial. Dar-

rell Atwood testified that he had not seen either man's face, and was unable to identify either of them. Bessie and Hubert Dixon did not testify. Consequently, no eyewitness to the shooting identified defendant as one of the assailants.

Although Mrs. Atwood had informed investigators that she had spoken briefly with the man identified as Dwayne Wright, she did not participate in a pretrial voice lineup to try to identify him by voice as well as by picture. Nevertheless, over defense counsel's objections, Mrs. Atwood was permitted to make an in-court identification of Wright's voice. Wright stood in front of the witness and repeated the only two words she had heard "Dwayne" say: "Ed" and "Dwayne." Based on Wright's saying those two words, Mrs. Atwood testified that he was the man who had called himself "Dwayne" on August 11.

Because the defense's theory was that neither Wright nor defendant had been at the Atwood residence on the night of the shooting, identification of the two assailants was crucial. Defendant now argues that Valerie and Tanya Atwood's identification of Dwayne Wright was unreliable and should not have been admitted into evidence. More specifically, defendant argues that the improper identification evidence violated his rights to due process and a fair trial. *U.S. Const.* amends. V and XIV; *N.J. Const.* of 1947 art. 1, paras. 1, 10.

### 1. Standing

■ Initially, we conclude that defendant has standing to challenge the identifications of his co-defendant. Although a litigant generally may assert only his or her own constitutional rights, *State v. Saunders*, 75 *N.J.* 200, 208–09, 381 *A.*2d 333 (1977), when the party raising the claim "is not simply an interloper and the proceeding serves the public interest, standing will be found." *In re Quinlan*, 70 *N.J.* 10, 34–35, 355 *A.*2d 647, *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976).

Defendant claimed that neither he nor Wright had been at the Atwood residence on August 11, so any evidence that placed Wright at the scene also bolstered the State's case against defendant. Thus, Valerie Atwood's identification of Wright's voice adversely affected defendant. Moreover, the voice identification helped resolve a critical question at trial—which of the defendants had stood directly in front of the door and which had fired the shots. Because defendant has a substantial personal stake in the admissibility of the identification evidence, we conclude that he has standing to challenge the trial court's ruling on that question. *Cf. State v. Ravenell*, 43 *N.J.* 171, 183, 203 *A.*2d 13 (1964) (holding defendant has no standing to attack voluntariness of co-defendant's statement because it was admitted solely against co-defendant, all references to defendant had been deleted, and appropriate limiting instructions were given).

2. The Photo Identification

Defendant claims that Valerie Atwood's in-court and pretrial photographic identifications of Wright were inadmissible because they were "clearly influenced by suggestive factors." We disagree.

As the United States Supreme Court has stated, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968). In *Manson v. Brathwaite*, 432 *U.S.* 98, 97 *S.Ct.* 2243, 53 *L.Ed.*2d 140 (1977), the Court held that reliability is the "linchpin" in determining admissibility of identification testimony. *Id.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154. To determine whether admission of identification evidence will violate due process, courts must determine whether "the corrupting effect of the suggestive

identification" outweighs its reliability. *Ibid.* Factors to be considered in evaluating reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description * * *, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Ibid.* (citing *Neil v. Biggers*, 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972)); *see also State v. Hurd*, 86 *N.J.* 525, 548, 432 *A.*2d 86 (1981) (discussing the federal cases).

Viewed against those standards, the photographic lineup procedure was not impermissibly suggestive. See *State v. Madison*, 109 *N.J.* 223, 234, 536 *A.*2d 254 (1988) (finding pretrial identification unduly suggestive based on "sheer repetition of defendant's pictures"). Before trial, the court conducted a hearing to determine the admissibility of the photographs. *Evid.R.* 8; *United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967). At that hearing, Detective Michael Scott Fitz–Patrick of the Burlington County Prosecutor's Office testified that he prepared a photographic lineup and on September 27, 1984, presented it to Mrs. Atwood. All the pictures depicted black males who had slight facial hair. No names were on the photographs, and Wright's picture was not highlighted. After viewing the array for two minutes and without any prompting, Mrs. Atwood identified Wright's photograph.

■ Although Mrs. Atwood had previously told investigators that the photograph of Wright that had appeared on television depicted the man who had been at her house, it is unclear whether the picture included in the lineup was identical to that photograph. Even if the photograph was identical, however, the record supports the trial court's finding that the identification procedure was not so suggestive as to give rise to a substantial likelihood of misidentification. *State v. Ford*, 79 *N.J.* 136, 398 *A.*2d 95 (1979), *rev'g on dissenting opinion* 165 *N.J.Super.* 249, 254, 398 *A.*2d 101 (App.Div.1978); *State v.*

*Farrow,* 61 *N.J.* 434, 450–53, 294 *A.*2d 873 (1972), *cert. denied,* 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973).

 The trial court also correctly concluded that there was "nothing constitutionally unreliable about the identification * * *." As the court noted, Mrs. Atwood had a substantial opportunity to view Wright at a time when she was particularly interested in his identity. Her description of the assailant was consistent with Wright's actual appearance. The time lapse between the identification and the crime—six weeks—was not extensive, and Mrs. Atwood was confident of her identification. Thus, the totality of the circumstances indicates that Mrs. Atwood's identification of Wright was properly admitted into evidence. *Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411.

### 3. Tanya Atwood's In–Court Identification

 Tanya Atwood could not identify Wright or defendant from the same photographic lineup as that shown to her mother. Some nineteen months later, however, at trial, she identified Wright as the man who had called himself "Dwayne." Defendant asserts that that identification should not have been admitted because it "rested upon influences other than the witness' observations during the crime * * *." We cannot agree.

Notwithstanding that Tanya Atwood identified defendant for the first time in court, her identification was constitutionally valid. *See United States v. Domina,* 784 *F.*2d 1361, 1368 (9th Cir.1986) (observing that no decision of the Supreme Court requires in-court identifications to meet the same standards of reliability as pretrial identifications), *cert. denied,* 479 *U.S.* 1038, 107 *S.Ct.* 893, 93 *L.Ed.*2d 845 (1987). Although undercut by the long delay between the crime and the trial, the reliability of the identification is supported by other considerations. Like her mother, Tanya had ample opportunity to view the assailants under circumstances in which she was seeking to establish their

identities. The courtroom atmosphere was suggestive, but not so much so as to outweigh the reliability of the identification. Defense counsel had ample chance to challenge the accuracy of the identification on cross-examination, and the jury was free to discount its value based on Tanya's inability to identify anyone on earlier occasions. *See Domina, supra,* 784 *F.*2d at 1368 (noting that one advantage of in-court identification over pre-trial identification is that jury can observe witness during identification process). We conclude that the identification was properly admitted.

### 4. The Voice Identification

■ Mrs. Atwood's in-court voice identification is more troubling. The constitutional safeguards applicable to visual identifications apply equally to voice identifications. *State v. Johnson,* 138 *N.J.Super.* 579, 582, 351 *A.*2d 787 (App.Div.), *certif. denied,* 71 *N.J.* 340, 364 *A.*2d 1072 (1976). Consequently, a voice identification is inadmissible if its reliability is outweighed by the suggestiveness of the identification procedure. Reliability depends on such factors as the witness's opportunity to hear the accused and the consistency with prior voice identifications. *See Biggers, supra,* 409 *U.S.* at 199–201, 93 *S.Ct.* at 382–83, 34 *L.Ed.*2d at 411–12 (holding that identification evidence, including voice identification, was properly admitted based on determination that "totality of the circumstances" indicate that identification was reliable, even though procedure was suggestive).

■ Defendant correctly argues that the procedure in this case was suggestive. The identification occurred in the courtroom, where the witness's attention was already focused on Wright. *See Domina, supra,* 784 *F.*2d at 1368 (noting that "there can be little doubt that the initial in-court identification is suggestive"); *see also Webb v. Havener,* 549 *F.*2d 1081, 1086–87 (6th Cir.) (discussing unavoidable suggestiveness of a "show-up," where witnesses knew defendant was man suspect-

ed by police), *cert. denied sub nom. Jago v. Webb*, 434 *U.S.* 873, 98 *S.Ct.* 220, 54 *L.Ed.*2d 153 (1977). Wright was the only speaker. Moreover, Wright used the same language as that used by the assailant on the night of the shooting. *See Domina, supra,* 784 *F.*2d at 1371–72 (recommending the use of neutral language during voice-identification procedure).

Neither does the totality of the circumstances support the reliability of the identification. Twenty months elapsed between the shooting and the trial. Mrs. Atwood heard the assailant speak only two words on the night of the shooting, and her trial testimony was unsupported by any identification at a prior voice lineup. She seemed certain that it was Wright whom she had heard speak on August 11, but she also testified that there was nothing distinctive about Wright's voice.

■ Because of our resolution of other issues, we need not decide whether admission of the voice identification requires reversal of defendant's conviction. On remand, defendant will be tried alone, and the problem may not again arise. We offer the admonition, however, that before admitting voice-identification testimony, the trial court should weigh the reliability of the identification against the suggestiveness of the identification procedure.

## D. *Guilt–Phase Instructions*

Defendant alleges numerous errors in the trial court's guilt-phase jury instructions. He claims that the charges regarding murder and aggravated manslaughter were erroneous and confusing. Defendant also asserts that the trial court "diluted" the State's burden of proving every element of the crime beyond a reasonable doubt, and thus denied him a fair trial. Finally, defendant argues that the court should have issued a limiting instruction concerning admissions made by his co-defendant.

### 1. Jury Instructions on Murder and Aggravated Manslaughter

Defendant claims that in charging the jury, the trial court suggested that a reckless state of mind would suffice to support a conviction of knowing or purposeful murder. He also challenges the charge on aggravated manslaughter.

Proper instructions are essential to a fair trial, *Green, supra,* 86 *N.J.* at 287, 430 *A.*2d 914, but reviewing courts must evaluate the entire charge to determine whether it was misleading or ambiguous. *State v. Freeman,* 64 *N.J.* 66, 69, 312 *A.*2d 143 (1973). "[I]f on reading the charge as a whole, 'prejudicial error does not appear, then the verdict must stand.'" *Ramseur, supra,* 106 *N.J.* at 280, 524 *A.*2d 188 (quoting *State v. Council,* 49 *N.J.* 341, 342, 230 *A.*2d 383 (1967)).

The trial court misstepped once in the instructions on both murder and aggravated manslaughter. Viewing the charge as a whole, those errors do not compel reversal.

In its guilt-phase charge, the court stated, in relevant part:

Now, each of these two men is charged with the crime of murder. Murder is defined in our criminal law as the unlawful killing of one person by another, either purposely or knowingly. A person commits a crime—who commits a crime, does so purposely when it is his conscious object to cause death or serious bodily injury resulting in death. A person who commits a killing does so knowingly when he is aware that what he is doing has the capacity to cause death or serious bodily injury resulting in death, and that it is practically certain to cause death or serious bodily injury resulting in death under the circumstances of his actions.

\* \* \* \* \* \* \* \*

In either case, whether the killing is committed purposely or knowingly, causing the death or serious bodily injury resulting in death, [it] must be within the design and contemplation of the defendant. Serious bodily injury means bodily injury which creates serious risk of death. Before you may properly return a verdict of guilty to murder, you must be satisfied beyond a reasonable doubt that the defendant or defendants caused the death of Edward Atwood. And two, that it was done either purposely, that is, with the conscious purpose to kill, or knowingly, that is, with an awareness that what he was doing was practically certain to cause death or serious bodily harm resulting in death.

\* \* \* \* \* \* \* \*

A person is guilty of aggravated manslaughter if he recklessly causes the death of another person under circumstances manifesting extreme indifference to the value of human life.

\* \* \* \* \* \* \* \*

With regard to the first element, in order for you to find that the defendant caused Edward Atwood's death, you would have to find that Edward Atwood would not have died but for the conduct of the defendant.

Two, with respect to the second element, recklessness, in order to find a defendant recklessly caused Mr. Atwood's death, you would have to find that the defendant was aware of and consciously disregarded a substantial and [un]justifiable risk that death would result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the defendant's conduct, his disregard of that risk is a gross deviation of the standard of reasonable conduct that a reasonable person would follow in the same situation.

\* \* \* \* \* \* \* \*

And the third thing, the element of this is the term circumstances manifesting extreme indifference to the value of human life. This phrase does not focus on the defendant's state of mind, but rather on the circumstances under which you find he acted. The State must prove a defendant acted in a way that showed he was indifferent to whether or not Edward Atwood lived or died. That is, that the defendant acted in a way that showed he didn't care that someone was killed.

With respect to aggravated manslaughter, the defendant must have acted in a way under circumstances involving the probability of death.

The trial court tried to explain the mental states relevant to different forms of homicide. It explained a "knowing" state of mind by stating: "You didn't mean to do it, but you are doing acts which are certain to bring about a death. You just don't care whether it happens or not." Although the last statement was incorrect, that isolated reference in an otherwise adequate murder charge is unlikely to have confused the jury.

In the charge on aggravated manslaughter, the court referred to reckless manslaughter rather than aggravated manslaughter. Because the proper language was used in the remainder of the charge, we conclude that the jury could not have been misled by that one misstatement.

■ The trial court's explanation of aggravated manslaughter is more troubling. In attempting to describe the difference between aggravated and reckless manslaughter, the court stated:

> Now, the difference between aggravated manslaughter and [reckless] manslaughter, is the difference in the degree of risk that death will result from the defendant's conduct. The degree of risk in reckless manslaughter is a possibility of death. Aggravated manslaughter elevates the risk of death from a possibility to a probability of death.
>
> \* \* \* \* \* \* \* \*
>
> I will give you some examples, okay. It is always a question for a jury to characterize certain behavior. As to whether or not it would really be aggravated manslaughter or reckless manslaughter. In trying to think up examples I was trying to think of the more serious crime, the aggravated manslaughter, where a person acts recklessly under circumstances manifesting extreme indifference to the value of human life. And I pictured somebody with a real powerful speedboat racing along the ocean and coming up to a beach that's crowded with people. And deciding that they would like to show off how fast they can go and how close they can go to the shore. And maybe in somebody's eyes make themselves a hero. So they will be roaring into a bunch of swimmers, realizing that if the boat ever touched the swimmer, it would kill them. And being aware that the boat probably is going to hit some swimmers. That would be very extreme conduct. But you couldn't say they went there for the purpose of killing people, or that they even knowingly were aware for sure that they were going to hit somebody.

Defense counsel objected, stating that the speedboat example more accurately described conduct that was practically certain to cause death or serious bodily injury resulting in death. Consequently, the example described a knowing murder, not aggravated manslaughter. Without seeking to foreclose the use of concrete examples, we believe that the one quoted above does not merit repetition on retrial.

### 2. Jury Instructions on Reasonable Doubt

During summation, counsel for both defendants understandably discussed the State's burden of proof. Wright's attorney analogized reasonable doubt to the doubt that might arise when someone forgets to turn off an iron:

> When I think of reasonable doubt, I think of a human experience that I had and I'm sure you've had, too \* \* \*. I remember going away in the summer-

time * * *. I remember it was like three hours after the time we were supposed to leave that we finally got on the way, after everybody went to the bathroom and did all the other things they're supposed to do; and I remember riding about one block * * * when my wife turned to the daughter who had been pressing a dress to take with her and said, "Did you turn off the iron?" * * * And my daughter said, "Yeah. Yeah, I turned off the iron;" and we rode about another block and she said, "I think I turned off the iron;" and we rode another block and she said, "I'm pretty sure I turned off the iron."

Well, you know what happened. We turned around and we went back, okay, and I suggest to you that that conversation was reasonable doubt. She was pretty sure before the question was asked that she had done it, but the more she thought about it, the more unsure she became; and it was so important to be sure that we had to go back * * *.

He also referred to a "balancing scale" that is "weighted totally in favor to the Defendant because he has a presumption of innocence * * *." The State's burden of proving its case beyond a reasonable doubt would be satisfied only if "the scale has been totally reversed and * * * the State's side has been brought down, not to equilibrium, but down to the extreme [other side] * * *."

Counsel for defendant also discussed the issue, stating: "If you think a person is probably guilty, you must vote not guilty. Probably is not enough. The only thing that's enough is proof beyond a reasonable doubt, and there's a big difference between the two."

The trial court referred to those statements in its guilt-phase jury instructions and gave the following charge regarding "reasonable doubt":

Reasonable doubt is not a mere possible or imaginary doubt, because everything involving human affairs is open to some doubt. A reasonable doubt is an honest and reasonable uncertainty as to the guilt of the defendant existing in your mind after you have given full and impartial consideration to all of the evidence. It may arise from the evidence itself or from a lack of evidence.

Now, let me take a minute to talk about this. A few comments. Both [defense attorneys] in their remarks to you discussed reasonable doubt, and what they said was substantially correct. But there are a couple of things that I wanted to mention to you.

[Wright's attorney] used an example. Told you a story about shutting off an iron in a house, and saying, well, when you begin driving, you begin to wonder whether the iron was shut off or not. That is a reasonable doubt. And I

suggest to you that is not an accurate example of what a reasonable doubt is or isn't.

I have defined reasonable doubt to you and it is a term that evolved through the years, through centuries, really. That definition I gave to you is a historic definition as to what it means. A reasonable doubt is essentially directed to our minds and not to our feelings. Cases are supposed to be decided based upon our understanding of human behavior and the weight that we give to the testimony of a witness.

\* \* \* \* \* \* \* \*

Now, there are different kinds of human knowledge. And certain areas that can be high degree of certitude. Some scientific things are known with [a] great degree of certainty. In mathematics I know that two and two are four. And that's the way it is. But criminal trials don't involve that kind of scientific knowledge. They involve a different kind of knowledge. And it is always probability. There is no such thing as absolute proof in a criminal case.

\* \* \* \* \* \* \* \*

[I]n a civil case, the standard is preponderance of the evidence. You win if it is more likely that your side of the case is true than not true. And so when you use the balance scale example which [Wright's counsel] did so well, he said, you know, if things are in equipoise, nobody has won. But if the weight of the evidence favors one party just by the tiniest bit, then that party wins.

\* \* \* \* \* \* \* \*

And in a criminal case the standard is higher. You know, if you were using that balance beam, the scale would have to be tilted more in the favor of the State in order to find a person guilty [than] it would be necessary for the scale to be tilted in order for a person to win on a civil case. The main idea is it is directed to human judgment and your common sense.

This is a serious matter and you have to be reasonabl[y] careful. You know, you can't decide these kinds of things rationally. You have to base it not on feelings and guesses, but on judgments based upon evidence that's in the case. Based upon the way you know that people behave and the way they act. And so when somebody says—and I think [defendant's attorney] said probably isn't enough—I need to correct that and say, that statement isn't true as it stands. It is a question of how probable. \* \* \* I will read the classic definition one more time.

\* \* \* \* \* \* \* \*

A reasonable doubt is not a mere possible or imaginary doubt, because as you know everything relating to human affairs is open to some doubt. A reasonable doubt is an honest and reasonable uncertainty as to the guilt of the defendant existing in your mind after you have given a fair and impartial consideration to all the evidence. It may arise from the evidence itself or from the lack of evidence.

██ Defendant asserts that this charge was inadequate because the court did not specify the degree of probability required to establish guilt beyond a reasonable doubt. He also contends that the example of the iron, used by Wright's counsel, was an adequate metaphor, which the trial court should not have criticized. According to defendant, the court's reference to a balancing scale, which omitted the "clear and convincing evidence" standard for civil cases, failed to clarify the applicable standard of proof. He argues that the charge "diluted the State's burden of proof and erroneously rejected counsel's position by downgrading the degree of certitude required." We disagree.

The trial court repeatedly stated that to convict defendant the jury must be convinced of his guilt beyond a reasonable doubt. The court then attempted to inject some meaning into those words. It twice repeated the Model Jury Charge definition of the term and discussed its meaning at length. Although the court's discussion of the balancing scale could have been more fully developed, we do not believe the instruction misled the jury. Viewed in its entirety, the charge was more than adequate. *See State v. Hunt*, 115 *N.J.* 330, 372–73, 558 *A.*2d 1259 (1989).

### 3. Lack of Limiting Charge Regarding Wright's Admissions

██ Defendant raises as plain error the omission by the trial court of a limiting instruction concerning certain admissions allegedly made by Wright to Paul Grant. *Evid.R.* 6. Grant testified that on the day after the shooting, "[Wright] told me he took care of business." Asked to explain what that meant, Grant stated: "It means a hit * * * fulfill a contract. It means he went over and did the hit. * * * Shoot somebody." Grant also testified that on that same day, Wright showed him the money he had been paid for participating in the shooting.

Defendant also claims that part of the statement made by Grant during interrogation by investigating police was improp-

erly used on cross-examination. In the statement, Grant responded to questioning:

Question: Did either Dwayne Wright or James Clausell tell you how many shots they fired when they performed that hit in New Jersey?

Answer: No, I don't—it wasn't mentioned. I don't quite remember. I can't say. * * * I think it was mentioned three times. I'm not sure. I'm not positive.

When the prosecutor objected that Wright's counsel was misconstruing the statement, the court informed the jury "[defense counsel] read it correctly. * * * The statement [is] ambiguous. I don't know whether that means on three different occasions the perpetrator said a certain number of shots were fired or whether they said three shots were fired * * *." Defendant now objects to the court's use of "they" on the ground that the jury could have believed that it referred to him and Wright, not Wright alone.

Wright's statements to Grant were admissible against Wright under the hearsay rule's exceptions for admissions by a party, *Evid.R.* 63(7), or for declarations against interest, *Evid.R.* 63(10). The State contends that the statements did not implicate defendant, and therefore that a limiting instruction was unnecessary. Defendant asserts, however, that the statements implicated him because they helped establish that Wright, and thus that defendant, had participated in the shooting.

Because defendant will be tried alone on remand, no useful purpose would be served by providing guidelines for a joint trial. We note, however, that the State contends that Wright's statements were admissible against defendant as vicarious admissions of a co-conspirator. *Evid.R.* 63(9) provides that

[a] statement that would be admissible if made by the declarant at the hearing is admissible against a party if * * * at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.

On the State's request, the trial court dismissed the conspiracy-to-commit-murder charges against both defendant and Wright. Absence of a conspiracy charge does not necessarily negate the admissibility of a co-conspirator's statements.

*State v. Carbone*, 10 *N.J.* 329, 338–39, 91 *A.*2d 571 (1952). Before admitting such statements, however, a trial court must find that they were made in furtherance of and during the course of the conspiracy and that "a fair preponderance of evidence" independent of the hearsay statements supports the existence of the conspiracy and of defendant's relationship to it. *State v. Phelps*, 96 *N.J.* 500, 509–10, 518, 476 *A.*2d 1199 (1984). On remand, should the State seek to introduce Wright's statements under *Evidence Rule* 63(9), the court should make the appropriate findings when determining their admissibility.

### E. *Other Alleged Guilt–Phase Errors*

Defendant also asserts as grounds for reversal numerous alleged trial errors. Our review of the record indicates that most of defendant's claims are either without merit or unlikely to recur. Defendant correctly argues, however, that witness Theodore Strembeck, a composite artist for the New Jersey State Police, gave improper opinion testimony supporting the credibility of Valerie Atwood, and that a hearsay statement made by the prosecutor to Paul Grant should not have been admitted into evidence.

While being cross-examined by Wright's attorney, Strembeck stated that he considered Valerie Atwood to be a "suitable, very good witness." Defendant's counsel did not object to that reference. Later, Strembeck was asked to explain the notation "9E" on the composite drawing:

A. That means that she was a dynamite witness. Very good. There's a code that I put. 10 would probably be the highest. Maybe somebody with a photographic memory. And I can only suspect maybe three or four witnesses in my 15 years. So a 9 would be very close to that. An 8 or a 9.

Q. What does the E mean?

A. That she was very easy to work with.

Q. That has to do with her personality as opposed to her artistic sense?

A. Well, it doesn't have to do with her artistic sense. It has to do with maybe her consistency and perception. Her consistency in her description. Easy to work with has a lot to do with it. Whether she has characteristics of good memory.

The witness iterated this testimony on questioning by the prosecutor, stating that he believed Mrs. Atwood was "very good" as a witness.

The State argues that those statements were admissible as lay-opinion testimony regarding Valerie Atwood's demeanor during the composite-drawing interview. *Evid.R.* 56(1). We disagree. In our view, the testimony improperly bolstered the credibility of a key prosecution witness. *Evid.R.* 4.

 Defendant also argues that a statement made by the prosecutor to Paul Grant prior to trial should have been excluded as inadmissible hearsay. *Evid.R.* 63. On redirect, the prosecutor engaged in the following line of questioning:

Q. Mr. Grant, you and I had a discussion sometime in the latter part of February, March, didn't we?
A. Yes, we did.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Q. Do you remember the conversation we had back in February or so?
A. Yes, sir.
Q. What did I say to you?
A. You said—

Wright's attorney objected that the proffered statement was inadmissible as hearsay, but the trial court overruled his objection. Grant then stated: "You told me my statement was going to be released and I would be subpoenaed to court and it would be in my best interests for me to be put under witness protection. You were concerned about my safety."

Although this testimony should have been excluded as hearsay, *Evid.R.* 63, we find admission of that statement was harmless beyond a reasonable doubt. Grant had already testified that he believed that he was in danger as a result of his testifying and that he had been shot at by an unknown assailant. The hearsay statement thus merely iterated a fact of which the jury was already aware. Given Grant's overall testimony, we cannot conclude that defendant was prejudiced by Grant's reference to the prosecutor's out-of-court statement.

## F. *Prosecutorial Misconduct*

██ Defendant asserts as prosecutorial misconduct numerous references to the victim's personal qualities and family life. During his opening statement, the prosecutor outlined in some detail the hours preceding the shooting and the activities of the Atwood family as contrasted with those of defendants. The apparent goal was to demonstrate that defendants came from a "different world" than that of the victim or the jurors:

> The story begins in the summertime, 1984, August the 11th. It begins basically in two places: One is a house in Willingboro in the Millbrook section of Willingboro on Marlboro Lane; and it also begins on the streets of Philadelphia, northwest Philadelphia. In the house on Marlboro Lane lived the Atwood family: Edward Atwood, 37 years old; his wife, * * * and their two children, Tanya at the time I believe was about 12 or so, and Darrel, a young man, in 1984, I believe was a junior, sophomore, junior in high school.
>
> Also at the home, the Atwood home, were Bessie and Hubert Dixon, the grandparents of Edward Atwood. He at the time was 37 years old and his grandparents were visiting him from Cleveland.
>
> They had a nice family get-together in the early evening hours of August 11th. Mr. Atwood went out and got crabs and all sat around the table and had a nice early summer evening get-together. They all sat around. They ate. They had conversation.
>
> Earlier in the evening they had made plans to go over to watch the Sixers' rookie game. Those of you that follow sports know that in that time frame they have rookie games where the one set of Sixers will play another set of Sixers and the crowds come and they watch it.
>
> That's what their plan was that evening. Edward Atwood was going to take his grandfather over to watch the Sixers' rookie game. Mrs. Atwood, the mother of the two children, took Tanya out shopping. They were off on their various planned events that evening.
>
> At the same time when all this was going on in the streets of Philadelphia, the northwest section of Philadelphia, two men, James Clausell and Dwayne Wright, these two men here were hanging on a street corner. They got a phone call. They went to the phone and they talked to a person, a person by the name of "D." That's his nickname, "D." His real name is Daryll Cherry. You will hear about him.
>
> They got a call from Daryll Cherry and they were told the time has come. Now you're going to go to New Jersey. Now you're going to take that contract. You're going to do the job that you said you would do, and they made their plans.
>
> At the same time Mr. Atwood was arriving at the Sixers' rookie game with his grandfather. They sat. They watched the game. Presumably had a nice time.

Mrs. Atwood was at the Cherry Hill Mall with Tanya. Young Darrell, the son, was at home sick. He had a stomach ache. So he was at home resting.

During direct examination, Tanya Atwood also discussed the crab dinner, her father's trip to the basketball game, and her shopping excursion with her mother. Valerie Atwood iterated that testimony on questioning by the State and also noted that at her husband's instruction, she had purchased a "surprise" gift for her mother while out shopping. Darrell Atwood repeated essentially the same facts. All three witnesses mentioned that the victim was particularly interested in basketball, and that formerly he had coached a high-school team. Both Tanya and Valerie Atwood also testified regarding the victim's recent hip surgery. Valerie indicated that her husband, after two years of unemployment because of his disability, had planned to return to work the Monday following the shooting.

The prosecutor drew on that testimony during his guilt-phase summation:

Ed Atwood's world was one in which he spent time with his family, helping young men learn to play basketball. The other world, [defendants'] alien world, is a world like [defense counsel] said. It is the wild west. It is okay corral. Guns, drugs, craziness is going on all the time. What happened was, the world of Ed Atwood collided with the world of Roland Bartlett and James Clausell and Dwayne Wright. It collided.

Although a prosecutor may tell the jury something about the victim and his or her family, the comments and trial testimony regarding Edward Atwood and his family should have been more restrained. As the United States Supreme Court has held, a victim-impact statement may not be admitted in a capital case because it "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Booth v. Maryland,* 482 *U.S.* 496, 505, 107 *S.Ct.* 2529, 2534, 96 *L.Ed.*2d 440, 450 (1987). The Court has also found error where the prosecutor, rather than the victim's survivors, describe to a capital jury the victim's personal characteristics. *South Carolina v. Gathers,* 490 *U.S.* 805, ——, 109 *S.Ct.* 2207, 2210–11, 104 *L.Ed.*2d 876, 883 (1989). Similarly, this Court has condemned the use in capital cases of inflammatory and irrelevant

evidence regarding the victim and his or her family. *See Pennington, supra,* 119 *N.J.* at 566–71, 575 *A.*2d 816; *Williams, supra,* 113 *N.J.* at 446–54, 550 *A.*2d 1172.

 We have recognized that "[a]ny capital trial will necessarily involve testimony and physical evidence pertaining to the victim." *Williams, supra,* 113 *N.J.* at 451, 550 *A.*2d 1172. Some reference to the victim's family was unavoidable because family members had witnessed the crime and because defendant was charged with aggravated assault of each person near the foyer at the time of the shooting. Here, however, the record demonstrates that "the prosecutor intended to divert the jury from the material facts to the worthiness of the victim * * * [and] intended to use the character and family of the victim to excite the jury." *Pennington, supra,* 119 *N.J.* at 571, 575 *A.*2d 816. Such conduct was improper. As this Court has held, "[w]here * * * the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecutor may not comment on the evidence that serves only to highlight the victim's virtues in order to inflame the jury." *Williams, supra,* 113 *N.J.* at 451–52, 550 *A.*2d 1172; *see also Pennington, supra,* 119 *N.J.* at 567, 575 *A.*2d 816 (discussing testimony regarding victim's family life by children of the victim). The same proscriptions obviously apply to prohibit a prosecutor from eliciting prejudicial victim-impact testimony through friends or relatives of the victim.

 Defendant alleges other instances of prosecutorial misconduct that, with one exception, we find to be without merit. During his guilt-phase summation, the prosecutor made a troubling reference to the shooting. He stated: "You got Valerie on the floor trying to shut the door before these maniacs come through and massacre the family."

As we have in other recent cases, we caution the prosecutor not to make derogatory statements about a criminal defendant. *See Pennington, supra,* 119 *N.J.* at 576–77, 575 *A.*2d 816; *Williams, supra,* 113 *N.J.* at 455, 550 *A.*2d 1172; *State v.*

*Wilson,* 57 *N.J.* 39, 50–51, 269 *A.*2d 153 (1970). Contrary to the State's assertion, the term "maniacs" is just as derogatory as similar epithets condemned by other courts. *Darden v. Wainwright,* 477 *U.S.* 168, 180, 106 *S.Ct.* 2464, 2471, 91 *L.Ed.*2d 144, 156–57 (1986) ("animal"); *State v. Stewart,* 162 *N.J.Super.* 96, 102–03, 392 *A.*2d 234 (App.Div.1978) ("young punk"). By no means were these comments, as the State suggests, "based on a characterization of the evidence." *See Pennington, supra,* 119 *N.J.* at 577, 575 *A.*2d 816. Moreover, nothing in the record supports the prosecutor's assertion that defendants attempted to come "through the door and massacre the family." As we recently stated, although "[p]rosecutors may fight hard, * * * they must also fight fair." *Ibid.*

### G. *Defendant's Right to Address the Jury*

 The trial court did not inform defendant of his right to allocution until immediately before it imposed the death sentence. Defendant's counsel waived the right to speak on defendant's behalf, stating: "[T]he Legislature has provided the very specific penalty. It does not allow for any flexibility by the court. Therefore, remarks by myself or my client would be redundant." In response to a specific question from the court, defendant also declined the opportunity to speak. Defendant asserts that the failure to inform him of his right to address the jury prior to closing arguments constitutes reversible error. We disagree.

In *State v. Zola,* 112 *N.J.* 384, 431–32, 548 *A.*2d 1022 (1988), we held that capital defendants have a right to make a brief, unsworn statement to the jury after all evidence has been presented during the penalty phase. Because the right to allocution was not constitutionally grounded, however, the ruling in *Zola* was applied prospectively. We specifically held that failure to advise a capital defendant of his right would not be grounds to reverse a conviction entered prior to that decision. *Id.* at 431, 548 *A.*2d 1022. The trial here occurred over two years before *Zola.* Consequently, we conclude that the failure

to afford defendant the right of allocution does not constitute reversible error. *Rose, supra,* 112 *N.J.* at 546, 548 *A.*2d 1058. In the event of retrial of the penalty proceeding, the trial court should advise defendant that he may exercise his right of allocution. *Ibid.*

### H. *Alleged Penalty–Phase Errors*

Defendant claims that the trial court's penalty-phase jury instructions were erroneous in many respects. He contends that the instructions on aggravating factors c(4)(b) and c(4)(d) failed to define the elements of those factors. Defendant also asserts that the charge minimized the importance of the mitigating factors and failed adequately to apprise the jury of its option of returning a non-unanimous verdict. Finally, defendant claims that the charge diluted the jury's sense of responsibility for its verdict. We address these arguments seriatim.

### 1. Aggravating Factors 3c(4)(b) and 3c(4)(d)

*N.J.S.A.* 2C:11–3c(4)(b) states that one aggravating factor is that "[i]n the commission of the murder, the defendant purposely or.knowingly created a grave risk of death to another person in addition to the victim." The court, however, did not then define the phrase "purposely or knowingly." That omission was exacerbated by the prosecutor's erroneous comment on summation that the jury's aggravated-assault verdict predetermined the finding of "grave risk to another" within the meaning of c(4)(b).

The court began its charge on aggravating factor c(4)(b) by correcting the prosecutor's misstatement. It then charged:

> The State alleges the following aggravating factors: One, in the commission of the murder, the Defendant purposely or knowingly created a grave risk of death to another person in addition to the victim. And you'll see that listed on the verdict sheet in front of you, up top.

Thus, contrary to defendant's assertions, the trial court informed the jury both that aggravating factor c(4)(b) differs from aggravated assault and that conviction for that offense

does not predetermine a finding of the aggravating factor. *See State v. Ragland,* 105 *N.J.* 189, 195–96, 519 *A.*2d 1361 (1986) (reaffirming prior holding that in bifurcated trial jury must be instructed to disregard prior verdict and require State to prove all elements of second charge beyond reasonable doubt). As indicated, however, the court failed to define the purposeful or knowing state of mind required for the "grave risk" factor. The absence of such an instruction must be considered in light of the erroneous charge on aggravated assault, which failed adequately to discuss the requirement that the assault be "knowing." See *supra* at 316–20, 580 *A.*2d at 229–31.

As with aggravated assault, the jury can find that defendant purposely or knowingly created a "grave risk of death" to persons other than the victim only if it concludes that he was aware those persons were present in the Atwoods' foyer. On remand, even if the court defines "purposeful" and "knowing" conduct on the guilt phase, it should also define those terms on the penalty phase.

Defendant also challenges the jury charge on aggravating factor c(4)(d), that defendant "committed the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value." According to defendant, the trial court "vastly oversimplified" that factor by referring to it as "murder for hire."

The essence of c(4)(d) is that the murder was committed in exchange for something of value. Accordingly, the court explained, without objection, that factor was "statutory language saying [defendant] was hired to do the killing." On remand, if necessary, the court should expand that statement by telling the jury that it must specifically find that defendant either received payment, or expected to receive payment, for having killed Edward Atwood.

### 2. Instructions Regarding Mitigating Factors

Defendant also challenges the trial court's discussion of the mitigating factors, claiming that the instruction minimized

the importance of those factors. In its charge, the court explained the general function of mitigating evidence by stating merely that "mitigating factors are those which tend toward imposing a sentence of life imprisonment." As we discussed in *State v. Bey*, 112 *N.J.* 123, 167–71, 548 *A.*2d 887 (1988) (Bey II), decided after the trial in this case, "it is the trial court's duty to assure that a reasonable jury will understand the meaning and function of mitigating factors," *id.* at 169, 548 *A.*2d 887. We further stated that

> [w]ith respect to the general function of mitigating factors, the trial court should [make] clear that the attempt to establish the existence of those factors was not to justify or excuse defendant's conduct, but to present extenuating facts regarding the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death. [*Id.* at 170, 548 *A.*2d 887.]

Thus, the court should not merely read the statutory definition of the specific mitigating factors alleged by defendant, *Zola, supra,* 112 *N.J.* at 432, 548 *A.*2d 1022, but "must assure that there is no reasonable possibility that a juror will misunderstand the function of mitigating factors and the meaning of the particular factors on which defendant relies," *Bey II, supra,* 112 *N.J.* at 170, 548 *A.*2d 887. On remand, if a second penalty phase is required, the trial court should expand its charge to conform to those requirements.

### 3. Instructions Regarding a Non–Unanimous Verdict

 Defendant also argues that the trial court's penalty-phase instructions and the jury-verdict form failed adequately to inform the jury that a non-unanimous verdict is acceptable under the Act. A year before the trial, the Legislature made clear that in a death-penalty case, the jury should "be informed that a failure to reach a unanimous verdict shall result in sentencing by the court pursuant to subsection b [imprisonment]." *N.J.S.A.* 2C:11–3f. Despite the statutory amendment, on several occasions the court specifically stated that the verdict "must be unanimous, that is all twelve must agree to each answer checked." Only once did the trial court correctly in-

struct the jury that it could return a non-unanimous verdict. The verdict form compounded the confusion by specifically providing that the weighing decision between aggravating and mitigating factors "must also be unanimous."

As we have previously stated, "juries in capital cases [must] be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment * * *." *Ramseur, supra,* 106 *N.J.* at 312, 524 *A.*2d 188; *see also Bey II, supra,* 112 *N.J.* at 177–81, 548 *A.*2d 887 (requiring retrial of penalty phase where jury was not informed of possibility of non-unanimous verdict).

Although the instructions here did not omit all references to a non-unanimous verdict, the focus of both the charge and the verdict form was on unanimity. *See Bey II, supra,* 112 *N.J.* at 178, 548 *A.*2d 887 (discussing similar verdict-form language). To that extent, the charge was misleading. On remand, the trial court should instruct the jury in accordance with *N.J.S.A.* 2C:11–3f and our decisions in *Ramseur* and *Bey II.*

### 4. Dilution of Jury's Sense of Responsibility

▮ In *State v. Ramseur, supra,* 106 *N.J.* at 315, 524 *A.*2d 188, this Court held that reversal of the defendant's death sentence was required because the trial court's choice of language "may well have left the jury with the impression that it was not responsible for the decision sentencing defendant to death." More recently, we stated:

> The court's instructions must communicate to the jury that a death verdict is not the product of a mechanical application of the statute, but is a reflection of the jury's normative judgment that death is "the fitting and appropriate punishment." Jurors are not mere fact finders, but the ultimate determiners of whether the defendant shall live or die. [*Bey II, supra,* 112 *N.J.* at 162–63, 548 *A.*2d 887 (citation omitted).]

Here, the trial court opened the penalty-phase proceeding by stating:

> [T]he way the [death penalty] statute works is that if a person's been found guilty of a type of murder that falls within certain categories set out by the Legislature, then the question arises as to whether the death penalty should be

imposed. And the judge decides whether or not to impose the death penalty based on what the jury tells him the aggravating and mitigating circumstances are.

In its penalty-phase instructions, the court stated that "the weighing process [of balancing aggravating against mitigating factors] is not mechanical or numerical * * *." Earlier in the charge, however, the court had implied that the sentencing decision was for the court, not the jury. In its initial remarks, the court stated:

> You the jury must decide whether Mr. Clausell is to be sentenced to death or sentenced by me to a term of years between thirty years and life, of which thirty years must be served before the Defendant is eligible for parole. So, what I'm saying to you is no matter what sentence I give in this case, Mr. Clausell must serve thirty years before he can be considered for parole.

Later, the court informed the jury:

> If you find the State has proven at least one aggravating factor beyond a reasonable doubt, but are not satisfied as to the existence of any mitigating factor, so mark the jury sheet and announce your verdict that that will lead to the conclusion that I would have to impose the death penalty.

The instruction was incorrect. Although it is for the court to impose the death penalty based on the jury's verdict, the jury decides whether the defendant is to die. On remand, the court should avoid remarks that tend to undermine the jury's sense of responsibility for the imposition of the death penalty.

### 5. Balance of Aggravating and Mitigating Factors

We also note that in its penalty-phase instructions the court informed the jury both that it must decide "whether the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors" and "whether the mitigating factors outweigh the aggravating factors." To impose the death penalty, the jury must specifically find that the aggravating factors outweigh the mitigating, not the reverse. *State v. Biegenwald,* 106 *N.J.* 13, 62, 524 *A.*2d 130 (1987). On remand, the trial court should conform its jury charge to our decision in *State v. Biegenwald.*

### V

#### A

■ The State moved for leave to appeal from the suppression of the tapes of three telephone conversations between defendant and Detective Michael Scott Fitz–Patrick of the Burlington County Prosecutor's Office. The tapes were made without defendant's knowledge while he was in the Burlington County Jail awaiting trial. We granted the State's motion, and now affirm the suppression of those statements as violations of defendant's right to counsel.

The following summary is drawn from the factual findings made by the trial court after a five-day hearing on the motion to suppress. In the fall of 1984, following defendant's indictment in August for Atwood's homicide, Fitz–Patrick negotiated with defendant about waiving extradition from Pennsylvania where defendant was incarcerated on other charges. Over the ensuing eighteen months, Fitz–Patrick cultivated defendant in an attempt to obtain his cooperation in the prosecution of Roland Bartlett for Atwood's murder and on unrelated murder investigations in which defendant was not implicated. To obtain defendant's cooperation, Fitz–Patrick offered to take defendant from the jail for food he craved.

In 1985, after defendant had been extradited to New Jersey, a complication arose in the preparation of his defense because the same lawyer represented defendant and Bartlett, who paid for defendant's legal fees, as well as his own. At a hearing in July 1985, the trial court stated that the lawyer could not represent defendant because of a conflict of interest. On August 7, defendant was taken from the county jail to court "to name his then attorney." While waiting to appear in court, Fitz–Patrick struck up a conversation with defendant outside the courtroom. On August 13, defendant's present counsel began representing him. The trial court found "that during a period between June 26 and the very early part of August Fitz–Patrick and Sergeant Ryan interviewed Mr. Clausell and

removed him from the jail and tried to secure information from him regarding other investigations." In exchange for a cheeseburger, defendant agreed to discuss the possibility of cooperating with the prosecutor's office. At the outset, Fitz–Patrick administered *Miranda* warnings. Defendant, however, refused to sign a written waiver of his rights and invoked his right to remain silent concerning the Atwood homicide. At the conclusion of the meeting, Fitz–Patrick invited defendant to call at any time if defendant wanted to talk. Defendant did not accept the invitation until December 1985, when he placed three telephone calls to Fitz–Patrick.

Defendant originated those calls from his cell. As the trial court explained, such calls were made "collect," and Fitz–Patrick accepted the charges. According to the trial court, Fitz–Patrick's "primary goal was to secure Clausell's cooperation in making a case against Bartlett. He testified that he was not specifically trying to develop further evidence to convict Clausell * * * [b]ut, of course, in testifying for the State against Bartlett * * * Mr. Clausell would also necessarily implicate himself." Fitz–Patrick also sought to elicit information about two other homicides.

Without telling defendant, Fitz–Patrick decided to tape the telephone conversations, but because he did not expect defendant's call, he was unable to start the tape recorder for five to fifteen minutes. Based on testimony presented at the suppression hearing, the trial court found that Fitz–Patrick had not administered *Miranda* warnings during that period. The court further found that when Fitz–Patrick had asked defendant if he wanted to talk about the Atwood murder, defendant had stated that he did not call for that purpose and did not want to discuss the case.

Nonetheless, in the course of the conversation, Fitz–Patrick asked defendant if the Atwood "shooting" differed from the "shooting" allegedly done by another inmate who shared defen-

dant's cell. In reply, defendant made a possibly incriminating statement about the Atwood homicide.

Because of violations of defendant's rights under the fifth and sixth amendments to the United States Constitution, the trial court excluded the inculpatory statement, as well as other statements made on December 3 and 4. The basis for the finding of the fifth-amendment violations was that the statements resulted from custodial interrogation that required the administration of *Miranda* warnings. The court also found that the State had failed to meet its burden of proving that defendant had knowingly and intelligently waived his right to counsel and right against self-incrimination.

The State contends that the trial court erred in finding that the telephone calls initiated by defendant constituted custodial interrogation requiring the administration of *Miranda* warnings. It argues that although defendant was in jail at the time of the conversations, he initiated the calls and was free to hang up the telephone. Therefore, he was not subjected to the coercive pressures that can exist when an interrogator and a suspect are in the same room. Accordingly, the State asserts that "no custodial interrogation" situation existed requiring *Miranda* warnings. Additionally, the State argues that the trial court erred in finding that the State had not proved that the defendant had knowingly and intelligently waived his fifth- and sixth-amendment rights. It contends that evidence in the record clearly establishes a sufficient waiver of rights by defendant.

### B

Both state and federal constitutions provide that a criminal defendant has "the right to * * * have the Assistance of Counsel" for his defence. *U.S. Const.* amend. VI; *N.J. Const.* of 1947 art. 1, para. 10. That protection embodies "a realistic recognition of the obvious truth that the average

defendant does not have the professional legal skill to protect himself." *Johnson v. Zerbst,* 304 *U.S.* 458, 462–63, 58 *S.Ct.* 1019, 1022, 82 *L.Ed.* 1461, 1465 (1938). Extending beyond the right to representation at trial, the right to counsel attaches at all critical stages of criminal proceedings. *Maine v. Moulton,* 474 *U.S.* 159, 170, 106 *S.Ct.* 477, 484, 88 *L.Ed.*2d 481, 492 (1985). In particular, once a suspect is charged with a crime, "he has a right to legal representation when the government interrogates him." *Brewer v. Williams,* 430 *U.S.* 387, 401, 97 *S.Ct.* 1232, 1240, 51 *L.Ed.*2d 424, 438 (1977). Moreover, this right "does not depend upon a request by the defendant." *Id.* at 404, 97 *S.Ct.* at 1242, 51 *L.Ed.*2d at 438.

As stated in *Patterson v. Illinois,* "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." 487 *U.S.* 285, 290 n. 3, 108 *S.Ct.* 2389, 2393 n. 3, 101 *L.Ed.*2d 261, 271 n. 3 (1988). Beginning with *Massiah v. United States,* 377 *U.S.* 201, 84 *S.Ct.* 1199, 12 *L.Ed.*2d 246 (1964), the Supreme Court has consistently held that after indictment, law-enforcement officials may not in the absence of counsel deliberately elicit incriminating statements from a defendant. *Id.; Moulton, supra,* 474 *U.S.* 159, 106 *S.Ct.* 477, 88 *L.Ed.*2d 481 (1985); *United States v. Henry,* 447 *U.S.* 264, 100 *S.Ct.* 2183, 65 *L.Ed.*2d 115 (1980); *Brewer, supra,* 430 *U.S.* 387, 97 *S.Ct.* 1232, 51 *L.Ed.*2d 424.

In *Moulton,* the Supreme Court stated:

Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. * * * [A]t the very least, the prosecutor and the police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel. [474 *U.S.* at 170–71, 106 *S.Ct.* at 484, 88 *L.Ed.*2d at 492–93.]

Hence, it concluded that "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the

intentional creation of such an opportunity." *Id.* at 176, 106 *S.Ct.* at 487, 88 *L.Ed.*2d at 496. Moreover, even if the suspect initiates the contact with the police, the State remains bound to honor the right to counsel. *Id.* at 174–75, 106 *S.Ct.* at 486–87, 88 *L.Ed.*2d at 494–96.

In this case, defendant was represented by counsel when he placed all three calls to Fitz–Patrick, a fact that Fitz–Patrick candidly acknowledged. Fitz–Patrick, however, did not warn defendant that he was taping their conversations, that the statements made during the conversations would be used against him, or that defendant had a right to have his counsel present during the questioning. In fact, when specifically asked in one of the conversations, Fitz–Patrick denied taping the discussions. Furthermore, in the first telephone conversation with Fitz–Patrick on December 2, defendant expressly stated that he did not want to discuss the Atwood murder, that he did not want to be questioned about it, and that he called only to discuss other investigations.

We find that the State failed to prove that defendant knowingly and intelligently waived his right to counsel. *Patterson, supra,* 487 *U.S.* at 288–90, 108 *S.Ct.* at 2393, 101 *L.Ed.*2d at 270. To admit statements such as those made by defendant in response to Fitz–Patrick's questioning, the State must prove that the suspect was aware of and voluntarily relinquished or abandoned the right to have counsel present at the interrogation. *Ibid.* Stated differently, "the accused must '[k]now what he is doing' so that 'his choice is made with eyes open.' " *Id.* at 292, 108 *S.Ct.* at 2395, 110 *L.Ed.*2d at 272 (quoting *Adams v. United States ex rel. McCann,* 317 *U.S.* 269, 279, 63 *S.Ct.* 236, 241, 87 *L.Ed.* 268, 275 (1941)). Moreover, "courts indulge in every reasonable presumption against waiver." *Brewer, supra,* 430 *U.S.* at 404, 97 *S.Ct.* at 1242, 51 *L.Ed.*2d at 440. Under our State Constitution, the State must prove waiver of a constitutional right "beyond a reasonable doubt." *Gerald, supra,* 113 *N.J.* at 118, 549 *A.*2d 792 (collecting cases).

At the conclusion of the hearing, the trial court found that the statements by defendant were clearly voluntary and uncoerced. The key issue for the court was whether defendant knowingly and intelligently waived his right to counsel. The trial court concluded that "[i]f there had been a *Miranda* warning in this case, an expressed *Miranda* warning, I would have no difficulty in admitting this evidence * * * [b]ecause it would clear up the fact that this man knew what he was doing was giving the State an opportunity to develop evidence against him." The court found, however, that in the absence of *Miranda* warnings, nothing in the record supported the State's burden to prove that defendant had been aware of the existence and content of his right to counsel. We agree.

In an attempt to salvage admission of the statements, the State points to Fitz–Patrick's assertion that he would be willing to take defendant out of jail to get a cheeseburger, but that he could not do so without the permission of defendant's counsel. Unfortunately for the State, Fitz–Patrick made that assertion long after defendant had made his most inculpatory statement in the December 2 conversation. Additionally, we are unpersuaded by the argument that the assertions were sufficient to apprise defendant of his rights. Telling a defendant that his attorney must agree to his removal from jail to get a cheeseburger does not equate with advising him that he has a right to counsel during the conversation.

Here, moreover, defendant told the detective that he did not want to discuss the Atwood murder. Implicit in that statement was defendant's concern that he could not protect himself. Furthermore, by inquiring whether Fitz–Patrick was recording their conversation, defendant expressed a concern similar to that implicit in the request not to discuss the Atwood murder. In light of those considerations, the mere fact that defendant initiated the telephone call does not constitute a knowing waiver of his right to counsel.

We affirm the trial court's finding that the State failed to prove that defendant had knowingly and intelligently waived his right to the assistance of counsel during the conversation. Thus, we do not pass on the trial court's determination that the failure to administer *Miranda* warnings also required suppression of the conversations. Resolution of that issue depends initially on whether defendant was "in custody" at the time of the interrogation. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda v. Arizona,* 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 706 (1966). The prophylactic rule of *Miranda* was adopted to preserve individuals' fifth-amendment right against self-incrimination in the face of the "inherently compelling pressures," *id.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719, brought to bear on a suspect subject to "incommunicado interrogation * * * in a police-dominated atmosphere," *id.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707.

Although the definition of "custodial interrogation" set forth in *Miranda* implies that warnings are required whenever a suspect in custody is questioned by the police, recent decisions of the United States Supreme Court reflect a more restrictive approach. In *Berkemer v. McCarty,* the United States Supreme Court stated that "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." 468 *U.S.* 420, 437, 104 *S.Ct.* 3138, 3148–49, 82 *L.Ed.*2d 317, 333 (1984). More recently, in *Illinois v. Perkins,* the Court "reject[ed] the argument that *Miranda* warnings are required whenever the suspect is in custody in a technical sense and converses with someone who happens to be a government agent." —— *U.S.* ——, ——, 110 *S.Ct.* 2394, 2397, 110 *L.Ed.*2d 243, 251 (1990)). Instead, the Court stated that the "essential ingredients" triggering the need ·for *Miranda* warnings are "a 'police-dominated atmosphere' and compulsion." *Id.* at ——, 110 *S.Ct.* at 2397, 110 *L.Ed.*2d at 251.

At first glance, the fact that defendant was in jail would seem to satisfy the requirement that he was subjected to "custodial interrogation." On further consideration, defendant's status is less clear.

Since the date of the trial court's decision that *Miranda* warnings were required, the United States Supreme Court has indicated that such warnings are necessary only when the defendant is subject to police domination, and not when he is technically in custody. *Perkins, supra,* —— *U.S.* at ——, 110 *S.Ct.* at 2395–99, 110 *L.Ed.*2d at 248–53. Given the "close" nature of the trial court's decision and the recent changes in the law, we are disinclined to reach the issue. For our purposes, it is sufficient that the taped conversations were obtained in violation of defendant's rights under the sixth amendment to the United States Constitution and article 1, paragraph 10 of the New Jersey Constitution.

The judgment of conviction is reversed, and the matter is remanded to the Law Division for retrial.

HANDLER, J., concurring in part and dissenting in part.

Defendant, James Clausell, was convicted of capital murder and sentenced to death. He was also convicted of three counts of aggravated assault and related weapons offenses. Defendant appealed his capital conviction to this Court as of right. *R.* 2:2–1(a)(3). The Court now reverses the capital-murder and derivative assault convictions and sets aside the death sentence.

I concur in the judgment of the Court. With respect to certain issues, there are additional reasons supporting the result it reaches that require comment. Further, there are several issues with respect to which the Court recognizes the existence of error, acknowledges their potential for serious prejudice, but avoids concluding that they constitute grounds for reversal. Those concern the testimony of a key prosecution witness and the admission of a voice identification. In my view, error with respect to those matters warrants reversal, and if

the Court believes that, it should say so. Capital-murder prosecutions are too important, complex, and controversial for the Court on appeal to assume an ambivalent or irresolute posture.

I also note my position that capital-murder jurisprudence is ongoing and evolving. The Court should reassess its earlier decisions determining that the capital-murder statute, as construed and applied by it, is constitutional in all respects. I strongly differ and continue to record my dissent from its disposition of these appeals.

I.

In *State v. Gerald*, 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988), this Court held that "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death' under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty." The Court agrees with defendant's claim that *Gerald* requires a reversal of his conviction and sentence. *Ante* at 316, 580 *A.*2d at 229. It points out that the trial court did not require the jury to distinguish between knowing or purposeful murder, which carries a possible death penalty, and serious-bodily-injury murder, which does not carry a possible death sentence. The jury instructions merged both forms of murder, making it impossible to determine "whether the jury convicted defendant or purposely or knowingly causing death or purposely or knowingly causing serious bodily injury that resulted in death." *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990) (applying *Gerald*). I concur in this determination.

I also agree with the Court's conclusion that there is a rational basis on which the jury could have determined that defendant had intended to cause serious bodily injury rather than death. "Omission of a *Gerald* charge is reversible error if the evidence is 'minimally adequate' to provide a rational basis

for the jury to find that defendant intended to cause serious bodily injury. *State v. Pitts*, 116 *N.J.* 580, 615, 562 *A.2d* 1320 (1989)." *State v. Pennington, supra*, 119 *N.J.* at 561, 575 *A.2d* 816.

Part of the evidence regarding defendant's state of mind in the shooting is derived from the testimony of Jennifer Schall, concerning what defendants had said before and after the murder, and the details of the shooting itself. Schall testified on direct examination that she had questioned Clausell, on their way to New Jersey, concerning the purpose of the trip. "[H]e said that—that he needed to collect money. This guy owed them money.... He just said, 'He owes us money, drug money.'" Schall stated that she had asked what would happen if the person did not have the money and that "[t]hey just said that maybe they'll smack him around a little bit or beat him up,...." Another exchange with Schall on direct examination addressed defendant's state of mind in the killing, suggesting that both Clausell and those who may have hired him to do the "hit" had been surprised that the victim of the shooting had died. *Ibid.*

Furthermore, portions of Schall's pretrial statement to the investigators, which was used in part to cross-examine her, implied that Wright, not defendant, had shot the victim. Schall's statement also indicated that the shooter had aimed low, presumably to injure, not to kill. Specifically, Schall stated:

Q What did they say happened back there at that residence?

A They told me that James [defendant] knocked on the door and asked for ... somebody. The guy said, "He doesn't live here." And James like stood there for a minute because supposedly their plan was Dwayne was supposed to pop out from behind a bush and he didn't in time, that the guy was just getting, slamming the door and ... Dwayne said the first time he shot the gun, it got caught on the jacket or something like that or it didn't fire right. So he shot again, and he shot the door, shot through the guy's front door because he had shut the door. So, *from what they told me, they tried to shoot at this guy and they shot low. He said they were shooting at his legs and that he was just gonna, he was trying to shoot his leg or something like that, hit him in*

*the leg and that he didn't, he didn't think he hit him, he said.* [Emphasis added.]

Schall's statement that the shooter had deliberately aimed low was also supported by Darrell Atwood's testimony that the shooter had "pointed downward" when taking the "last shot." That evidence generated by the State's investigation was not forthcoming at trial. It did not become a matter of record and is not relied on by the Court in support of its conclusion that defendant was prejudiced by the absence of a *Gerald* charge. *Ante* at 315, 580 *A.*2d at 229.

 In addition to the foregoing evidence bearing on defendant's intent, it is appropriate to point out, as the Court does, *ante* at 315, 580 *A.*2d at 229, that the trial court instructed the jury on aggravated manslaughter and reckless manslaughter. The court told the jury: "I suppose on the facts of this case if you concluded there was no intent to actually kill Mr. Atwood or to inflict serious bodily injury, but only attempt to scare him and shoot near him, then one of these lesser included offenses might be a possibility." If the trial court had believed there was a rational basis to support the aggravated manslaughter and manslaughter charges, then it surely would have believed, had it known to make the distinction, that there was a rational basis to support serious-bodily-injury murder charge, because the intent to commit that form of murder lies in between that of manslaughter and of knowing murder. *See, e.g., State v. Pennington, supra,* 119 *N.J.* at 562, 575 *A.*2d 816.

In his separate opinion, Justice Stein finds it "difficult to fathom the majority's conclusion that there is a rational basis in the evidence on which the jury could have determined that defendant had acted with 'an intent to inflict only serious bodily injury with no intention that death be the result.' " *Post* at 375, 580 *A.*2d at 261. His view is that the evidence in the record can lead only to the conclusion that this shooting was committed with an intent to kill. The evidence that he recapitulates, however, from the testimony of four witnesses to physical details of the shooting, hardly leads inexorably to the

conclusion that the shooting could have entailed only an intent to kill. Nothing to which Jennifer Schall testified exclusively supports a finding of an intent to kill. The fact that Paul Grant defined a "hit" as a killing does not tell us what defendant thought the word meant, and the fact that Grant concluded Wright and Clausell had been paid tells us nothing of Clausell's intent at the time of the shooting. The testimony by Gail and Darrell Atwood also tells us nothing conclusive about defendant's intent at the time of the shooting.

Justice Stein also writes that "the victim's effort to close the door in a vain attempt to save his life is hardly a basis on which a jury could conclude that a shot fired simultaneously was intended to injure only and not to kill," *post* at 376, 580 *A.*2d at 261. This perception of the evidence and of its bearing on the *Gerald* issue is seriously flawed.

With respect to the evidence, it misstates the majority's view to suggest that the question of intent hinges on "the victim's effort to close the door in a vain attempt to save his life." Rather, the evidentiary significance of the closed door is that it makes more difficult the determination of the intent of the shooting, because the assailant could not see clearly what he was shooting at. Further, this is only one piece of evidence that must be considered in determining defendant's intent at the time of the shooting.

The view expressed in the separate opinion appears to be that a shooting for hire, at close range, with a powerful gun can be committed only with an intent to kill. Maybe so, probably so. Yet a shooting for hire, at close range, with a powerful gun *could* be committed with an intent only to cause serious injury. It is a question for a jury, especially on the facts of this case.

Justice Stein states that "[a]bsent specific evidence in the record suggesting that defendant's intent was limited to the infliction of serious bodily injury only and that death was an unintended consequence," a homicide such as that in this case does not require a *Gerald* charge. *Post* at 373, 580 *A.*2d at 260

(quoting *State v. Coyle*, 119 *N.J.* at 201, 574 *A.*2d 951 (Stein J., concurring in part and dissenting in part)). That view implies that such homicides incur a presumption of capital-murder intent, and that it is the defendant who must show that the facts or the inferences to be drawn from them demonstrate only the intent to inflict serious bodily injury. That suggests that in some way the burden of proof is on the defendant to exculpate himself or herself from capital murder. The constitutional foundation of our criminal justice requires, however, that the State demonstrate that the evidence in this case shows beyond a reasonable doubt that defendant's intent was only to kill. Due process in criminal prosecutions places on the *State* the burden of proving guilt beyond a reasonable doubt. *Cupp v. Naughten*, 414 *U.S.* 141, 147, 94 *S.Ct.* 396, 400–01, 38 *L.Ed.*2d 368, 374 (1973). Furthermore, in this case it is worth noting that both defendants claim not to have been at the scene of the murder. To require them to produce evidence of serious-bodily-injury intent in order to avoid a jury conclusion of intent to kill would compromise their legitimate defense. The State, for its part, is certainly not going to present evidence of intent to cause serious injury when it is attempting to prove intent to kill, for that would compromise its effort to obtain a capital-murder conviction. Thus, Justice Stein's limitation of *Gerald* seems wholly inappropriate.

One could debate at length, if not endlessly, the inferences to be drawn from undisputed facts and the ultimate determination of intent to be made on those facts and on those inferences. Evidence of intent is amenable to debate, regardless of how one-sided. It is a misconception and misapplication of the appellate function to give that evidence a single interpretation. When an appellate court does that it indeed become the thirteenth juror.

The perception of the evidence as indicating only an intent to kill is not the only problem. It then becomes the basis for applying a standard of law that is also seriously flawed. We stated in *Gerald* that a defendant who intends to inflict serious

bodily injury resulting in death has not committed *capital* murder. 113 *N.J.* at 89, 549 *A.*2d 792. We did not rule, as now urged by Justice Stein, see *post* at 376, 580 *A.*2d at 261; *State v. Long*, 119 *N.J.* 439, 527, 575 *A.*2d 435 (1990) (Stein, J., concurring in part and dissenting in part); *State v. Pennington, supra*, 119 *N.J.* at 615, 575 *A.*2d 816 (Stein, J., concurring in part and dissenting in part); *State v. Coyle, supra*, 119 *N.J.* at 251, 574 *A.*2d 951 (Stein J., concurring in part and dissenting in part), that a defendant who intends *only* to inflict such serious bodily injury has not committed capital murder or, to put it differently, that a defendant who is indifferent between the intent to kill and the intent to cause serious bodily injury is guilty of capital murder. Yet Justice Stein argues that a defendant with a mixed intent can be guilty of capital murder.

In *Gerald, supra*, 113 *N.J.* at 72–73, 549 *A.*2d 792, the Court was clear in its decision to adhere to the teaching of *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982). We endorsed the principle that under our state constitution only a defendant who kills solely with the intent to kill can be found to have committed capital murder. A different intention accompanying a homicide does not constitutionally justify the death penalty. Our adherence to that principle is made even clearer by our rejection of the Supreme Court's decision in *Tison v. Arizona*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), in holding that under the state constitution a defendant who does not directly and personally intend to kill cannot be exposed to the death penalty. *State v. Gerald, supra*, 113 *N.J.* at 73–89, 549 *A.*2d 792. Hence, it cannot be overemphasized that a defendant who murders with an indefinite intent that is other than an exclusive intent to kill has not committed capital murder.

Because of the ambiguity in the record as to defendant's specific intent in the killing, I agree with the Court that the jury rationally could have found that defendant intended only serious bodily injury rather than death, and that the conviction

on knowing or purposeful murder is properly reversed. *State v. Pennington, supra,* 119 *N.J.* at 561–62, 575 *A.*2d 816; *State v. Coyle, supra,* 119 *N.J.* at 209, 574 *A.*2d 951; *State v. Gerald, supra,* 113 *N.J.* at 69–70, 549 *A.*2d 792. I believe, further, that if the jury were to find that defendant had a mixed intent in the shooting then he cannot be convicted of capital murder and cannot, therefore, be subject to the death penalty. *State v. Gerald,* 113 *N.J.* at 72–73, 549 *A.*2d 792.

## II.

Defendant argues that the jury instructions on murder indicated that the mental state of recklessness would suffice as the intent for "knowing" murder under *N.J.S.A.* 2C:11–3a. Both defendants objected at trial that the court had not properly communicated to the jury the mental state of knowing. Defendant specifically points to this statement by the trial court: "[Y]ou might kill a person purposely. That means you want to do it. Or you might kill a person knowingly. You didn't mean to do it, but you were doing acts which are certain to bring about death. *You just don't care whether it happens or not* .... You are aware, in terms of knowing, you are aware of circumstances which make death practically certain." (Emphasis added.) The Court says only that "[a]lthough [that] statement was incorrect, that isolated reference in an otherwise adequate murder charge is unlikely to have confused the jury." *Ante* at 331, 580 *A.*2d at 237. I believe the instruction was sufficiently misleading to warrant a reversal.

"In assaying the measure of success in the jury charge," the reviewing court must look at the charge as a whole. *State v. Freeman,* 64 *N.J.* 66, 69, 312 *A.*2d 143 (1973). The overall charge distinguished between the mental states of knowing and purposeful. The court informed the jury that "purposeful" entailed the "conscious purpose to kill," while "knowingly" involved "an awareness that what he was doing was practically certain to cause death or serious bodily harm resulting in

death." Following the sentence to which defendant objects (emphasized in the quoted passage above), the court stated that knowing involves awareness of "circumstances which make death practically certain." The court also gave charges on aggravated manslaughter, *N.J.S.A.* 2C:11–4a, and reckless manslaughter, *N.J.S.A.* 2C:11–4b. Regarding the element of intent for both of those crimes, the court told the jury it must determine whether "the defendant was aware of and consciously disregarded a substantial and justifiable risk that death would result from his conduct." The court elaborated: "The risk must be of such a nature and degree that considering the nature and purpose of the defendant's conduct and the circumstances known to the defendant, his disregard of that risk is a gross deviation of the standard of conduct that a reasonable person would follow in the same situation." With respect to aggravated manslaughter, the court expressly stated, "the defendant must have acted in a way under circumstances involving the probability of death."

Thus, the court delineated for the jury three mental states that correspond to purposeful murder, knowing murder, and (both aggravated and reckless) manslaughter. Reduced to their essentials, the mental states under the instructions in this case were "conscious purpose to kill" (for purposeful murder), awareness of "circumstances which make death practically certain" (for knowing murder), and awareness and conscious disregard of "a substantial and justifiable risk that death would result" from the conduct (for aggravated and reckless manslaughter). Because these distinctions are subtle and easily confused, the sentence to which defendants object, even in the context of the court's charge on knowing murder and the court's distinctions between the requisite mental states for purposeful murder, knowing murder, and manslaughter, appears to have engendered a prejudicial influence.

The trial court's statement that with knowing murder, "[the perpetrator] just [does not] care whether it happens or not" seems correct, although at the same time it confuses the

standards of intent for "knowing" and "recklessness." It is correct in the sense that, as the court told defense counsel, "[k]nowingly means you realize that you are going to cause a death, but you don't care whether you do or don't." Nevertheless, the court's charge approaches Justice O'Hern's explication of the mental state of recklessness under aggravated manslaughter: "'I couldn't care less, I don't care at all, I don't care in the least bit if the person dies, even though I know that my act possesses a high degree of probability of causing that person's death.'" *State v. Gerald, supra,* 113 *N.J.* at 139, 549 *A.*2d 792 (O'Hern, J., concurring). I have before observed: "These offenses, knowing murder and aggravated manslaughter, are couched in terms that in any given case can render the two indistinguishable." *Id.* at 151, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part). The confusion can work both ways. "Knowing murder ... can incorporate a degree of 'indifference' that can, on a given state of facts, serve to make aggravated manslaughter the functional equivalent of knowing murder," while "[c]onversely, on identical evidence, aggravated manslaughter can encompass a quality of indifference that could transform knowing murder into aggravated manslaughter." *Id.* at 150–51, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part) (citations omitted).

The instruction by the trial court in this case that "knowing" murder means "not caring" whether death results highlights the evasiveness of the distinction between the mental states of knowing murder and aggravated manslaughter. The instruction that "knowing" murder means "not caring" whether death results pulls the jury's attention away from the critical and fine distinction between practical certainty on the one hand, and awareness and conscious disregard of a substantial and justifiable risk on the other. It emphasizes the lack of care common to the mental state of both. At the very least, the charge in this case would have better served the legislative intent in distinguishing between the crimes of knowing murder and aggravated manslaughter if it had not included the superfluous

addition that knowing murder entails simply not caring whether death results.

## III.

Defendant also attacks the admission of Mrs. Atwood's in-court voice identification. He claims that the in-court voice identification itself was impermissibly suggestive. The Court treats that issue dismissively. *Ante* at 328–329, 580 *A.*2d at 236.

During redirect examination of Mrs. Atwood, the prosecutor asked the court for permission to have Wright "brought forward in the Courtroom, stand approximately 4 feet away from Mrs. Atwood and say the name 'Ed' and say the name 'Dwayne' for identification purposes." Four feet was the distance determined at trial between Mrs. Atwood and the man outside her front door on August 11; "Ed" and "Dwayne" were the only two words that the man spoke. Counsel for Wright objected that the procedure would be highly suggestive and argued that a lineup was required. Counsel for Clausell objected that the witness had testified that there was nothing distinctive about the voice at her door, and that the procedure would prejudice his client. The court overruled Wright's objection, stating that although courtroom identifications "are to some extent inherently suggestive, ... they're still admissible, but the weight that they have is something that's for the Jury to decide." The court also overruled Clausell's objection, finding that the probative value outweighed any possible prejudicial effect.

Before the jury, the court asked Wright to step forward in front of the witness stand. He did so, and the following transpired:

THE COURT: All right. Now, Mr. Wright, what we would like you to do is to say the name "Ed" and then pause for a minute and then say the name "Dwayne". Would you please do that.

DEFENDANT WRIGHT: Yes, Sir.

Ed (pause) Dwayne.

THE COURT: Thank you, Mr. Wright. You may have a seat....

## The prosecutor continued redirect examination:

Q Mrs. Atwood, have you ever heard that voice before?

A The way he says his name, "Dwayne", you can say it one way, but his—his "D" is different. That's what I hear in his voice; and when you sound like you're saying "Ed", it always seemed like it's a question.

THE COURT: So were you able to recognize the voice or were you not?

THE WITNESS: Yes.

THE COURT: All right. Now, I'll permit further questions on it in a moment, but I would like to tell the Ladies and Gentlemen of the Jury, this is what's called a voice identification, and it's for you to decide what weight it should be given. The possibilities are always present, that when a witness hears a person's voice in a Courtroom and they know the person is on trial for the crime, that that might suggest to them that this is, indeed, the person who committed the crime; or a witness might be basing the identification on having heard the voice at the time of the crime; and they may be the same person that committed the crime and that's why they recognize the voice. That kind of a decision is in the province of the Jury, and it's for you to decide what weight to give to this identification....

## The prosecutor resumed:

Q Ma'am, have you heard that voice before? Is that the voice of the man that was at your door that night?

A Yes.

Q And how do you know that?

A He said "Ed" to me. It was like—it's like a—it was like it was always like a question. Okay. And some people can just say—that can just say "Ed"; and then it was like when he said his name "Dwayne"—I can say it one way, and I can say it over and over "Dwayne", okay, but for me it was always—it was always the "D" in the way he said "Dwayne", and that's what stayed in my mind a lot.

Q And is that what you recognize here today?

A Yes.

Clausell does not argue that the in-court voice identification of Wright violated Wright's fifth-amendment privilege; rather, he contends that it was inadmissible due to its suggestiveness. *Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977), emphasized reliability as the "linchpin" for admissibility of identifications. That case involved the admissibility of a photo identification. Its balancing test between reliability and suggestiveness, however, is not inherently limited to the context of visual identifications. *See Neil v. Biggers*, 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972);

*United States v. Domina*, 784 *F.*2d 1361, 1374 (9th Cir.1986) (Schroeder, C.J., dissenting). The factors that relate to reliability (*Manson-Biggers* criteria) include

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. [*Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154; *see Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411.]

The reliability of the identification must be weighed against any suggestiveness in the procedure followed. *Ibid.; see State v. Hurd,* 86 *N.J.* 525, 548, 432 *A.*2d 86 (1981).

In this case, the witness had little opportunity to hear the person at her door. She did not hear a speech. She did not hear the person speak at length. She did not hear a complete sentence. According to the witness' own testimony, she heard the person speak only two words. They were one-syllable words. This kind of identification is as unreliable as would be a visual identification based on a two-second view of only a fragment of a person's head through a keyhole. Even under conditions that best facilitate the witness' full concentration, a witness can hardly take the full measure of a person's voice hearing only two one-syllable words. Two brief words hardly provide a basis on which the average person can identify the normal resonance, timbre, pitch, emphasis, and accent—much less the idiosyncrasies—of a person's voice. Moreover, the conditions in this instance were not conducive to the witness' full attention to the stranger's voice. Although Mrs. Atwood emphasized in her testimony that she was paying attention to the stranger at her door, trying to figure out who he was, she was concentrating as much on the two visitors' physical appearance as she was on the voice. She was able to supply the police with rather precise descriptions of the visitors' builds and their clothing. She was also able to provide enough details to help develop a sketch of the person who had stood at the door that she approved as a close resemblance. In short, her opportunity to hear the stranger's voice at the time of the crime was slight,

while her attention was not fully devoted to listening to that voice.

The third factor in the *Manson–Biggers* criteria, the accuracy of the witness' prior description, is not satisfied to any extent in this case. There was no prior description—indeed, Mrs. Atwood was unable to give one. Following the in-court confrontation, Mrs. Atwood was confident that Wright's voice was the one she had heard the night of August 11–12. Yet, in the twenty months between the homicide and the trial, the State never conducted a voice lineup or any other type of voice identification with Mrs. Atwood. In her statement of August 16, 1984, Mrs. Atwood had told investigators that the person who had spoken at her door had neither an accent nor a stutter. Further, her statement indicated that she said "No" to the question, "When the subject spoke, was there anything unusual or different about his manner of speaking?" At no time between the crime and the trial did Mrs. Atwood tell the State that she could recognize the voice if she were to hear it.

Finally, the vast length of time between the event and the in-court identification raises doubts about the reliability of the identification. Twenty months had elapsed between the crime and the identification. Although Mrs. Atwood testified that she had lived with that voice since the murder, twenty months' time surely takes its toll on any witness' memory of facts or of sensory perceptions. This Court has recognized time as a factor that can erase the prejudicial effects of pretrial publicity on potential jurors. The more time that passes between a period of prejudicial publicity and the beginning of trial, the Court has observed, the less likely such publicity might interfere with the jury's ability to determine the issues in a case only on the evidence introduced at trial. *State v. Biegenwald,* 106 *N.J.* 13, 35, 524 *A.*2d 130 (1987); *State v. Koedatich,* 112 *N.J.* 225, 272, 548 *A.*2d 939 (1988); *see Patton v. Yount,* 467 *U.S.* 1025, 1035, 104 *S.Ct.* 2885, 2890–91, 81 *L.Ed.*2d 847, 856 (1984). In view of the common sense and ordinary experience

that instruct us that the memory of a perceived fact is increasingly suspect the further removed in time is recollection from the perception, we should not repudiate that intuition with respect to a recollection that can lead to the death penalty.

An additional factor, not listed among the *Manson–Biggers* criteria, bears on the reliability of the identification in this case. The in-court voice identification occurred on Monday, April 7, 1986. On cross-examination of Mrs. Atwood toward the end of the preceding week, defense counsel had brought out the fact that the witness had not remembered anything distinctive about the voice she had heard. During the weekend prior to the 7th, the prosecutor had told Mrs. Atwood to be prepared for an in-court voice identification of Dwayne Wright on re-direct. There is no suggestion in the record that the prosecutor instructed the witness to make a positive identification. The notification to the witness, however, raises a further doubt about the reliability of her later identification. Mrs. Atwood was an able and perceptive witness and she was fully aware of the context in which she was asked to make the identification. We should not permit the State to take advantage of such a possibly deceptive investigative procedure without a full explanation. *See State v. DiFrisco*, 118 *N.J.* 253, 305, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part).

Not only was the in-court voice identification procedure clearly unreliable, it was also highly suggestive. To have Wright speak the same words as the assailant had spoken, from the same approximate distance as at the crime scene, was to make Wright, in front of the witness and the jury, assume the mantle of the perpetrator of this crime. *See, e.g., Domina, supra*, 784 *F.*2d at 1371–72 (recitation of neutral words preferable to recitation of those words used in crime). Forcing Wright to say the same words from the same distance was no different from making Wright wear red shorts and a white muscle shirt and pose in front of the witness.

The use of in-court voice identifications has been severely condemned for its suggestive and prejudicial impact. In *United States v. Brown*, 644 *F.*2d 101 (2d Cir.1981), a bank robbery case, the defendant challenged an in-court voice-identification procedure as a violation of his rights to counsel and due process. "During the trial one of the tellers ... testified that the robber said 'Give me your money, all your money, or I am going to blow you up,'" and at the prosecutor's request, the trial court required defendant to say those words in front of the witness and the jury. *Id.* at 103 (Oakes, J., dissenting). The Second Circuit rejected defendant's claims. Judge Oakes dissented, however, saying:

> [B]y having the defendant utter the threatening and menacing words that the robber had allegedly used, the Government ... gave the defendant an aura of criminality, thus providing a strong suggestion to the jury of his guilt. It is hard for me to conceive of a more prejudicial method of establishing a voice identification. Only if the jury had gone down to the bank and watched the defendant put on a ski mask, wave a toy gun, and shout "Give me your money or I'm going to blow you up," could Brown have been worse off. I know of no case—certainly neither the Government in its brief nor the majority in its opinion has found one—which justifies the use of an in-court identification procedure as suggestive and prejudicial as the one used here. [*Id.* at 106–07.]

In *Domina, supra,* another bank robbery case, one witness "was asked to identify the defendant after he had donned the mask of the robber," while another "was asked to identify the defendant's voice after he spoke the very words spoken by the robber." 784 *F.*2d at 1374 (Schroeder, J., dissenting). Judge Schroeder observed in his dissent that "[i]t is difficult to imagine any more corruptively suggestive procedures, short of transporting the jury to the bank and asking the defendant to reenact the crime." *Ibid.* Judge Schroeder succinctly summarized his view of the in-court identifications in that case: "The procedures at trial did not produce reliable or certain identifications. They did unfairly present the defendant to the witnesses and the jury in the guise of a criminal." *Ibid.*

In this case, the trial court attempted to dampen the suggestiveness of this voice identification, to a certain extent, with a curative instruction. The court alerted the jury to the possibili-

ty that the witness' knowledge that Wright was being tried for the crime might have influenced her identification. Such an instruction, however, may serve only to reinforce the prejudicial impact of the evidence if it was otherwise improperly admitted. *See State v. Long, supra,* 119 *N.J.* at 527, 575 *A.*2d 435 (1990) (Handler, J., concurring in part and dissenting in part).

In short, given its lack of reliability and its marked suggestiveness, the in-court voice identification was not properly admitted. *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154; *State v. Hurd, supra,* 86 *N.J.* at 548, 432 *A.*2d 86. I believe it played an important role in establishing the State's case beyond a reasonable doubt. In my opinion there is a reasonable doubt whether this evidence had the capacity to bring the jury to a determination it might not otherwise have reached. That constitutes an unjust result. *State v. Melvin,* 65 *N.J.* 1, 319 *A.*2d 450 (1974). The viewing of Wright in a re-enactment of part of the crime and Mrs. Atwood's adamant identification immediately following that re-enactment may well have dissipated any reasonable doubt in the jurors' minds that defendants were guilty. The potential harm to Clausell engenders greater concern and requires greater deference to the prejudicial influence of the error. Clausell ended up subject to the death penalty in part because of that error. "In the context of the death penalty, where the demands for fairness and accuracy are heightened, the principles of consistency and reliability rise to constitutional dimension." *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987).

## IV.

Defendant claims that the trial court erroneously permitted testimony alleging defendant's past misconduct and that the trial court erred further by not issuing a limiting instruction to the jury with respect to such testimony. The Court agrees with the State that testimony concerning past criminal behavior of defendant was admissible under *Evidence Rule* 55 to show

defendant's motive for killing Atwood. *Ante* at 323, 580 *A*.2d at 233.

Defendant is correct in his assertion that the trial court issued no limiting instruction under *Evidence Rule* 6 with respect to any evidence of alleged past misconduct. The Court agrees with defendant that, to the extent that any evidence of past misconduct was properly admitted under *Evidence Rule* 55, the trial court erred in failing to issue an instruction about the limited relevance of that evidence. *Ibid.; see, e.g., State v. Lair*, 62 *N.J.* 388, 391, 301 *A*.2d 748 (1983).

I would add that that omission takes on added prejudice because it occurs in the context of a capital-murder prosecution. The weighing that the trial court must undertake in applying *Evidence Rule* 55 and *Evidence Rule* 4 must be within a framework that focuses attention on the prejudicial effects not only with respect to guilt but also with respect to sentence. *State v. Pennington, supra,* 119 *N.J.* at 844, 575 *A*.2d 816 (Handler, J., concurring in part and dissenting in part); *State v. Long, supra,* 119 *N.J.* at 527, 575 *A*.2d 435 (Handler, J., concurring in part and dissenting in part).

## V.

With these additional reasons, I express my concurrence in part and dissent in part from the opinion of the Court.

STEIN, J., concurring in part and dissenting in part.

The jury convicted defendant of capital murder, imposing the death sentence in part on the basis of its determination in the penalty phase that defendant had been paid by the victim's neighbor, a Philadelphia drug-dealer, to commit the homicide. *N.J.S.A.* 2C:11–3c(4)(d). The murder was committed at close-range, the perpetrator firing twice through the front door from just outside the entrance to the victim's home as the victim was closing the door. The victim died of a single bullet wound to the chest. Defendant did not dispute the State's theory of a

murder-for-hire, but presented a defense on the basis that the homicide had been committed by two other persons affiliated with the drug-dealer's organization.

I join that portion of the Court's opinion reversing defendant's convictions for aggravated assault because of erroneous jury instructions. The Court also reverses defendant's conviction for capital murder, relying on our earlier decision in *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988), and determining that "the evidence here could rationally support a finding that defendant intended only serious bodily injury." *Ante* at 316, 580 *A.*2d at 229. On this record, I find no rational basis for a jury verdict of non-capital murder, which would have required the jury to conclude that defendant had shot at the victim intending only to injure him and not to cause death.

I reiterate the view that I expressed in *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990), that

> our holding in *Gerald* should have limited application in homicide cases in which the killing was committed with a gun fired at close range. Absent specific evidence in the record suggesting that the defendant's intent was limited to the infliction of serious bodily injury only and that death was an unintended consequence, such homicides ordinarily will not fit within the class of serious-bodily-injury murders that we immunized from the death penalty in *Gerald*. [*Id.* at 252, 574 *A.*2d 951 (Stein, J., concurring in part and dissenting in part).]

Finding that none of the other guilt-phase issues presents reversible error, I would affirm defendant's conviction for capital murder. I also join in the Court's determination that erroneous instructions to the jury in the penalty phase would require reversal of the death sentence.

The material facts are set forth in the majority opinion. The State's case presented persuasive evidence that the victim, Edward Atwood, was murdered at the behest of Roland Bartlett, a neighbor and leader of a Philadelphia crime organization, in retaliation for Atwood's complaint to municipal officials about Bartlett's dog.

The prosecution's principal witnesses were Jennifer Schall and Paul Grant. Schall testified that she had driven defendant

and Duane Wright to the victim's house; that just before the shooting defendant, holding a handgun, and Wright had left her car parked down the street from Atwood's residence; that she had heard two shots; and that Wright and defendant had run back to the car and had told her to drive away. On the trip back to Philadelphia, they had told her they were going to the Fleetwood Club, allegedly owned by Bartlett, to collect payment. The next day defendant had told her they "did good" and had been paid. They gave Schall money for having driven them to New Jersey.

Grant testified that he had been offered $5,000 to make the "hit," which he defined as a killing. Grant had refused the offer, and testified that defendant and Wright had agreed to shoot Atwood, stating that they had told him they would each receive $2,000 for their efforts. Grant testified that he had seen both men in Schall's blue Camaro on the night of the murder, that the next day Wright had told him he "took care of business," and later had shown him $1,200 that he had received for the shooting.

The eyewitnesses who testified specifically about the shooting were the victim's son Darrell and wife Valerie. Darrell testified that when his father had opened the front door, he had been sitting on top of the stairs leading to the second floor of the house, with a clear view of the door. He testified that his father had opened the door at about a forty-five-degree angle, and he could see the taller of the assailants opposite his father and the shadow of the shorter man standing to the left between a bush and the wall of the house. When his father had tried to close the door, the taller man had stepped aside, and the shorter man "came in the picture real quick. His arm was straight out. And there was a pop * * * you know, my father's down." Darrell testified that the shooter had "pointed downward and took the last shot." On cross-examination Darrell vacillated about whether the shooter had been trying to hit his father with the second shot, at one point suggesting that his father had fallen out of the shooter's range and later acknowledging

that the second bullet had been intended to hit his father as he lay on the floor.

Mrs. Atwood testified that she had heard the first shot as her husband had attempted to close the door. She had seen her husband fall, and had pushed her daughter Tanya to the floor. After having heard the second shot, she had crawled to the door, pushed it closed and locked it, and told Darrell to call the police.

The State also presented testimony indicating that the first bullet had entered the door frame four feet, seven-eighths inches above the concrete porch, and the second bullet three feet, eleven-and-five-eighths inches above the porch. Based on powder traces found on the screen, a sergeant from the county prosecutor's office testified that the gun had been approximately six inches from the closed screen when the second bullet had been fired.

In that factual context, it is difficult to fathom the majority's conclusion that there is a rational basis in the evidence on which the jury could have determined that defendant had acted with "an intent to inflict only serious bodily injury with no intention that death be the result." *State v. Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. The majority supports its conclusion, in part, by reference to matters outside the record. Thus, the majority suggests that a portion of Jennifer Schall's statement to police never introduced in evidence, *ante* at 314–315, 580 *A.*2d at 228–229, "confirms" its conclusion that the record affords a basis for a charge on serious-bodily-injury murder. I strongly disagree. Nor do I agree that the trial court's instruction to the jury on aggravated and reckless manslaughter has any bearing on whether serious-bodily-injury murder should have been charged. *Ante* at 315, 580 *A.*2d at 229.

From the record itself, the majority relies on Schall's testimony that defendant had told her after the shooting that Bartlett had wanted to "hurt" Atwood, and on Grant's testimony that defendant and Wright had been paid to perform a "hit," *ante* at

314, 580 A.2d at 228, terms far too nebulous to support the reliance placed on them by the majority. The majority also relies on Schall's testimony that defendant had told her that the victim had died and sought her help in regaining possession of his gun. The majority extracts an implication from this statement that defendant "was surprised that the victim had died." *Ante* at 314, 580 A.2d at 228. In my view no such implication is warranted or even permissible.

Finally, the majority observes that the shooting occurred at night and that "at the time of the shooting, Atwood had nearly closed the interior door." Thus, the majority notes that with his view "blocked, [the assailant] shot through both the outer screen door and the partially-closed interior wood door." *Ante* at 315, 580 A.2d at 229. I would suggest that the victim's effort to close the door in a vain attempt to save his life is hardly a basis on which a jury could conclude that a shot fired simultaneously was intended to injure only and not to kill.

We held in *Gerald* that under our state constitution,

one who takes the life of another with "an intent to inflict only serious bodily injury with no intention that death be the result" cannot be subjected to the death penalty. [113 *N.J.* at 89, 549 A.2d 792.]

The facts in *Gerald*, however, bear little resemblance to the contract killing depicted in the State's proofs in this case. No evidence in the record suggests that defendant's "conscious object" was to cause only serious bodily injury, but not death, to the victim, or that defendant was "practically certain" that only serious bodily injury, but not death, would result from the shooting. See *N.J.S.A.* 2C:2–2b(1) and (2) (defining "purposely" and "knowingly"). The evidence established that the assailant shot the victim at close range with a powerful handgun, and that the first shot entered the victim's body close to the heart. The majority's reference to the partially-closed door, or to the contract for a "hit," *ante* at 315, 580 A.2d at 229, in the context of the circumstances of this homicide is hardly adequate to constitute a "rational basis" for a conviction of serious-bodily-

injury murder. *See State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 276, 508 *A.*2d 167 (1986). As noted in *State v. Long, supra,*

one whose "conscious object" was to inflict serious bodily injury but not death, or who wished to be "practically certain" that only serious bodily injury would result, would never attempt to achieve that objective by shooting the intended victim in the chest at close range. [119 *N.J.* at 529, 575 *A.*2d 435 (Stein, J., dissenting).]

The reality is that absolutely nothing in this record suggests that the perpetrator of the Atwood homicide intended only to injure Atwood, not to kill him. Hence, the jury verdict necessarily constituted a determination that defendant purposely or knowingly caused the victim's death. See *State v. Pitts*, 116 *N.J.* 580, 615, 562 *A.*2d 1320 (1989). An instruction on the lesser-included offense of serious-bodily-injury murder on this record would have constituted an unwarranted invitation to the jury to return a compromise verdict unsupported by any evidence.

I would affirm defendant's conviction for capital murder, and remand for a new penalty-phase proceeding.

Justice GARIBALDI joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK and O'HERN—4.

*Concurring in part and dissenting in part*—Justices HANDLER, STEIN and GARIBALDI—3.